[No. 6892.]

## THE BUCKHORN PLASTER COMPANY v. THE CONSOLIDATED PLASTER COMPANY.

[No. 6893.]

## ALFRED WILD v. THE CONSOLIDATED PLASTER COMPANY.

1. **Appeals—Second Appeal—Law of the Case**—The judgment of this court is the law of the case upon a second appeal, the record exhibiting the same state of facts.—(520)

2. **Principal and Agent—Duties and Disabilities of Agent**—A corporate manager controlling real property for his principal cannot effectually convert such control into a possession for himself, even though such manager is the owner of the premises, and the corporation is his tenant.—(520)

3. **Quieting Title—Plaintiff's Possession**—A manufacturing corporation, whose manager, controlling its plant, has wrongfully assumed to exclude the corporation, assume possession for himself and control the business in his own behalf, may, notwithstanding such unlawful and illusory possession, maintain an action under Mills' Code, sec. 255, to quiet title.—(520, 521)

4. **Statute of Frauds—Oral Agreement Performed—Evidence**—To enforce, upon the ground of performance, an oral agreement which the statute requires to be in writing, the evidence must be definite, certain and clearly proved. The evidence examined and held to satisfy the rule.—(521-525)

5. **Parties—New Parties—Purchase Pendente Lite**—Where pending a bill to quiet title, the defendant assumes to convey the property to a third person, a supplemental bill bringing in the new purchaser is proper; and where in order to afford full relief

some act of the new party will be required, is necessary. A purchaser of realty having actual notice of the pendency of a writ of error in a cause involving the title, is affected by the result of the litigation and makes improvements at his peril. The Code provision, sec. 36, is a limitation upon the equitable doctrine that a litigation pending affects those who purchase during its pendency.—(526)

6.  Illegal Conduct—Effect on Property Rights—One who has tortiously assumed possession of the properties of a corporation, cannot defend his possession by the plea that the corporation was organized in pursuance of an unlawful combination to restrain competition; nor upon the ground that the corporation has purchased stock in other corporations, in violation of the statute. —(527)

7.  Evidence—Competency—To establish that the purchaser of realty from the defendant to a pending litigation took with notice of the rights of the plaintiff therein a contract of indemnity executed for him by his vendor is competent evidence.—(527)

8.  Appeals—Harmless Error—The exclusion of evidence offered by a defeated party will not reverse, where every controverted fact is established by incontestable evidence, so that no different judgment could have been given.—(528)

9.  Lease—Essentials of—It is not required that to constitute a lease, so as to pass an interest in the lands, rent should be reserved payable in the future. The rent may be paid in advance, and in property.—(529)

The lease of a manufacturing plant does not lose character, as such, by a provision that the lessor may himself operate it, if at any time the lessee shall discontinue its operation.—(529)

Where lands leased are then or afterwards improved, the destruction of the improvements by fire does not terminate the lease or the rights of the tenant, unless it is so agreed.—(530)

10.  Lease—Construction—The lease of a manufacturing plant carries with it the land which it occupies.—(531)

*Error to Larimer District Court*—Hon. JAMES E. GARRIGUES, Judge.

Mr. HUGH BUTLER, Mr. WM. A. MOORE, and Messrs. CRANSTON, PITKIN & MOORE, for plaintiff in error.

Mr. L. R. RHODES, and Mr. N. WALTER DIXON, for defendant in error.

Mr. JUSTICE GABBERT delivered the opinion of the court:

The ultimate question involved in these cases is the right of possession and control of a certain government subdivision of land, and a structure known as The Loveland Buckhorn Mill, and appurtenances, together with the land upon which the mill is situate. The Consolidated Plaster Company brought suit originally against Alfred Wild to quiet title to the property involved. The judgment was in favor of the defendant. The company brought the case to this court for review on error, where the judgment was reversed and the case remanded for a new trial. Upon filing the *remittitur* The Consolidated Plaster Company filed a supplemental complaint, to which The Buckhorn Plaster Company and James W. Auld were made defendants. The trial of the issues made by the pleadings resulted in a judgment for the plaintiff company. From this judgment the respective plaintiffs in error have brought the case here for review separately, and as the questions involved are similar, and the rights of the plaintiffs in error are more or less dependent upon the rights of each other, they will be considered together.

The original complaint was an ordinary one to quiet title. The remaining pleadings, except the supplemental complaint, are voluminous, and we will assume, without stating them in detail or effect, that they present for consideration the questions which the respective plaintiffs in error have presented for determination. The testimony is also voluminous, and the facts thereby established, or only such parts thereof as are necessary to consider in determining these questions, will be stated.

In 1892 The Stewart Stucco & Cement Company owned a mill located at Colorado Springs, and

gypsum beds situated in El Paso county.  The Rocky Mountain Plaster and Stucco Manufacturing Company owned a mill, located at Red Butte, Wyoming, and gypsum beds located near that place.  The Denver Gypsum Company owned a mill located upon leased property in the city of Denver, and held a lease-hold interest in gypsum beds situate in Larimer county.  Mr. Wild owned a mill located near Loveland, known as The Buckhorn Mill, and also owned certain lands and near-by gypsum beds.

These several concerns were competitors in business, and in 1892 they effected a permanent consolidation by organizing The Consolidated Plaster Company, a corporation with a capital stock of $20,000, which was equally divided between the owners of the above named plants, in consideration of which they leased to it their respective plants and gypsum beds for a period of twenty years—the term of the corporate existence of the lessee, The Consolidated Plaster Company.  Mr. Wild was elected a director and vice-president and general manager of the new company, and, in the capacity of manager, entered into the possession of the plant and beds located near Loveland, and operated them for the company until some time in 1902, when he notified the other officials of the company that he had withdrawn from the consolidation, and had taken possession of the Buckhorn plant for himself, and on his own account.  This action on the part of Mr. Wild was the basis of the suit originally instituted against him by The Consolidated Plaster Company.  The judgment of the trial court in that case was against the plaintiff, upon the ground that it was not in possession of the property at the time it instituted its action.  This judgment was reversed for the reason that the manager of a corporation cannot acquire a hostile possession of its property, of which he is in charge and con-

trol as such manager, so as to prevent it from maintaining an action to quiet title under our civil code, sec. 255, which provides that such action may be brought by any person in possession by himself or his tenant, of real property against any person who claims an estate therein adverse to him, for the purpose of determining such adverse claim.—*Consolidated Plaster Co. v. Wild,* 42 Colo. 202.

It is again urged upon our attention that the trial court erred in finding at the second trial that The Consolidated Plaster Company was in possession of the premises in controversy at the time it commenced its suit. The facts bearing on that question are no different from what they were when the case was here before for review, and what was then determined under these facts on that question is the law of the case; but, aside from this, there can be no question but that the attempt on the part of Mr. Wild to take possession of the premises in dispute in his own right was a nullity. He was plaintiff's manager, and in that capacity was in the possession and control of its property. While still sustaining that relation he undertook to take possession for himself. This he could not do, for the reason that one who holds possession of real estate as manager for another cannot dispute that other's title, or, while sustaining such relation to his principal, convert its possession through him into one for himself. It is now urged that Wild's right as owner and landlord should be considered, and for this reason he could assume possession of the property himself. We do not see how this can possibly make any difference. He had leased the premises in controversy to the plaintiff company, and as its manager, had entered into the possession and control of the leased premises on its behalf; and he had no more right to take possession of the lease-hold interest for himself, in

these circumstances, merely because he was the lessor
and owner, than if he had had no interest in the
premises whatever.  The lease-hold interest was what
was involved.  That was what his principal was in
possession of through him as its manager, and while
he sustained that relation to it, his possession was the
possession of his principal.  He could not abrogate
that relation temporarily, in whole or in part, so as
to relieve himself of the duty he owed the company
to maintain its possession of its property, of which
he was in charge.  Further, the law of the case, as
determined by our previous decision—42 Colo., *supra*
—is (quoting from the syllabus): "Where the title
claimed by plaintiff corporation was purely equitable,
being based upon an oral contract between it and
defendant, who was one of its directors, it had a
right, although out of possession, to maintain an ac-
tion under Mills' Annotated Code, section 255, to
quiet its title."

In 1894 the Denver plant was dismantled and
the machinery used in constructing the plant known
as The New Buckhorn Mill, adjacent to the old Buck-
horn plant.  One of the issues in the case was,
whether or not this new plant was constructed under
an oral arrangement between the plaintiff company
and Mr. Wild, whereby it was to be treated as a
lease to the company under the terms and conditions
of the lease originally executed by Wild.  The trial
court found in favor of the plaintiff company on this
issue.  Counsel for plaintiffs in error contend that
this was error, for the reason that the evidence was
not sufficient to justify such finding; that it was
indefinite and uncertain; and invoke the rule that
before an oral agreement relating to transactions
which the statute of frauds requires to be in writing
can be enforced upon the ground of performance by
the party seeking to have it enforced, it must be

clearly proved, and be definite and certain. The testimony bearing on this issue brings the case within this rule. In fact, from the testimony the findings of the trial court could not have been otherwise. Wild had a claim against the company owning the Denver plant. He brought suit against that company, levied upon its mill, had the same sold under execution, and eventually secured title by virtue of such sale. Several witnesses on behalf of the plaintiff testified to the effect that the company arranged with Mr. Wild that it would dismantle the Denver plant at its own expense, move it to the immediate vicinity of the Wild mill, use it in constructing a new plant, that the company would construct the mill building and all buildings essential, and also a railroad spur to the mill, in consideration of which the new plant was to take the place of the old, and was to be covered by the terms of the old lease, which, at the time of this arrangement, had between fifteen and sixteen years to run. The new mill was not constructed on the ground originally leased by Wild upon which the old plant was located, for the reason that it was more advantageous to place it some twelve or fifteen hundred feet distant, because water could be more readily secured and the raw material from the quarry more easily handled, and it was also less difficult to construct the spur to that point than to the ground in the immediate vicinity of the old mill.

Under this arrangement Wild was to be the owner of the new mill on the expiration of the new lease. Witnesses for the plaintiff also testified that the company carried out this arrangement and paid upwards of three thousand dollars of the expense of moving the machinery and erecting the new mill. Counsel on behalf of Wild claim that he denied such an arrangement was effected. If he did, he must have been mistaken, when we come to consider other

undisputed facts.   The old mill, that is, the Wild mill, after the new one was constructed, was released from the original lease, and was thereafter exclusively controlled by Mr. Wild.   The machinery from the Denver plant was moved as testified to by witnesses for the plaintiff.   The company disbursed over three thousand dollars as expense incurred in constructing the new plant.   From the time it was completed until the action of Wild in attempting to assume possession of the property, it was operated exclusively by the company, through him as its manager, for a period of about seven years.   For the first few years, the company had a hard struggle financially, and was able to continue operations only by reason of advances made by directors of the plaintiff company, upon money borrowed on their personal obligations. Finally, it began to pay dividends, which were distributed among the stockholders of the plaintiff company in proportion to their respective holdings of the capital stock of that concern.

As a preliminary step on the part of Mr. Wild in his attempt to wrest possession and control of the mill from the plaintiff company, he addressed a letter to its secretary and treasurer, a copy of which he forwarded to its president, in which, among other things, he proposed, in effect, that a meeting of the plaintiff company should be called for the purpose of closing up its affairs; that each of its lessors surrender and cancel the contracts and leases executed to it, and that the moneys and assets left, after the payment of debts, be distributed proportionately and equitably, and the corporation dissolved.   If there were no contract or lease which covered the new plant, why was there any necessity for proposing the surrender and cancellation of such instruments?   In a subsequent communication he stated, in effect, that he wished to formally advise the company that he

had resumed possession in his own right of the Buckhorn mill, and of the gypsum quarry or mine, together with all the appurtenances belonging to either or both, with the intent to use the property exclusively for his own use and benefit. If the property mentioned had not theretofore been in the possession of The Consolidated Plaster Company, why was it necessary for him to say he had resumed possession?

In a still later communication to the company, he stated in substance that he reiterated what was said in his former communication to the effect that it was his purpose and intention to segregate his property from the consolidated arrangement, and operate it for himself exclusively, in doing business in his own way and in his own name. If the new plant belonged to Mr. Wild unencumbered by any lease or contract with the plaintiff company, why was it necessary for him to write that "it is my purpose and intention to segregate my property from the consolidated arrangement, and to use it for myself exclusively, in doing business in my own way and in my own name"?

After he had assumed to take possession of the plant in his own name, he issued the following notice: "Notice is hereby given that the Buckhorn Mill, at Loveland, Colorado, which has heretofore been operated under a lease by The Consolidated Plaster Company, said lease having been terminated, will hereafter be operated and controlled by the undersigned, who is the owner of said mill, and the gypsum quarry by which it is supplied." The record does not disclose that there was any other lease of the mill to The Consolidated Plaster Company than the one under which that company claims its leasehold interest in the property in controversy; consequently, Mr. Wild recognized, over his own signature, that the lease under which the plaintiff company claims its rights had been entered into with Mr. Wild

as claimed by it.   By the lease executed by Wild to the plaintiff company it was provided that the latter should pay him a royalty of twenty cents for each ton of calcined plaster.   It appears that during the period Mr. Wild was operating the leased property for the plaintiff company, he was paid several thousand dollars in royalties by the company, from the proceeds of plaster manufactured and sold.   If he was not operating the new mill for the benefit of the company, why should it pay him any royalty?   These undisputed facts so clearly demonstrate that the finding of the trial court was right on the issue under consideration that further discussion and comment on that subject is unnecessary.

After the judgment of the trial court which was reversed in 42 Colo., *supra,* Wild assumed to sell the property in controversy to James W. Auld, who immediately sold and conveyed to The Buckhorn Plaster Company.   The latter entered into the possession of the property, and began to operate the mill.   These steps were taken while the former case was pending here.   After reversal and issuance of the *remittitur,* the plaintiff filed a supplemental complaint, making Auld and The Buckhorn Plaster Company defendants.   To this supplemental complaint all the defendants demurred.   The demurrers were sustained in part; but overruled in so far as the supplemental complaint was based upon an action to quiet title as against the new defendants.   Error is assigned upon this action of the court.   There is no merit in this contention.   A supplemental bill is proper to bring in as a party one who has acquired an interest in the subject-matter of controversy, since the commencement of the suit, as assignee or successor to an original defendant.—21 Enc. Pl. & Pr. 38; Hawes' Parties to Actions, §§ 11, 20; Story's Eq. Pl., § 156.

Generally speaking, a voluntary assignee *pen-*

*dente lite* need not be made a party to a bill, or be brought before the court, for every one purchasing *pendente lite,* except as modified by statute, is treated as a purchaser with notice. Still, however, it is often necessary to bring such assignees before the court, as parties, by supplemental bill in order to remove a cloud on the title to the property involved which might otherwise exist, or where it is necessary to compel the assignee to do some act in order to give the plaintiff full relief, so that such assignee, although not a necessary party, may be a proper one at the election of the plaintiff. Our Civil Code, sec. 16, provides that ''when a complete determination of the controversy cannot be had without the presence of other parties, the court shall order them to be brought in.'' This is but a declaration of the general rule, that all who are interested in the subject-matter of an action should be made parties thereto, so that complete justice may be done, and the rights of all parties in the subject-matter of controversy finally determined.—*Denison v. Jerome,* 43 Colo. 456.

In the case at bar The Buckhorn Plaster Company was not only a proper, but, possibly, a necessary party. Wild had assumed, through Auld, to surrender the possession of the plant and other property to that company. If the plaintiff succeeded, it was entitled to a judgment against Wild, and a writ for the possession of the property involved. Such a judgment and writ might not have been enforceable as against The Buckhorn Plaster Company unless it had been made a party to the suit. At least, there was an opportunity for it to make this claim, as we shall see later, when we come to consider some of the questions presented by counsel on behalf of The Buckhorn Plaster Company. The court was, therefore, clearly right in compelling it to answer the supplemental complaint, so that the rights of all parties

claiming any interest in the subject-matter of controversy might be settled and determined in one action and by one judgment.

It is next claimed that the court erred in finding that the plaintiff company was organized for a lawful purpose, and was not against public policy. In support of this claim it is urged on behalf of the plaintiff in error that the findings establish that plaintiff was a combination, or trust agreement, between the parties concerned, to prevent competition, and to make and maintain a price agreed upon by all the persons or corporations then engaged in the state of Colorado in the manufacture of plaster of paris, and therefore, against public policy, illegal and void. It is unnecessary to go into a discussion of this question. Whatever may have been the purpose or object of the plaintiff company, the property it acquired belonged to it, and Mr. Wild could not penalize it by appropriating its property.

It is also claimed that under the laws of this state, a corporation is forbidden to acquire and hold stock in another corporation. If the plaintiff corporation has violated the law in this respect, that would not confer upon Mr. Wild the right to divest it of its property in the manner attempted.

When Auld purchased from Wild, he took a contract to indemnify him against any loss or damage he might sustain, on account of any claim or right of The Consolidated Plaster Company. This contract, over the objection of the plaintiffs in error, was admitted in evidence. The contract was competent for the purpose of showing that Auld was a purchaser with notice of the claims made by The Consolidated Plaster Company to the subject-matter of controversy.

At the trial Auld was called as a witness by the plaintiff and examined as if under cross-examination

by virtue of the provisions of an act, entitled "Evidence—Admission of,". found in the Session Laws of 1899, at page 178. At the conclusion of his examination, the court refused to allow counsel for plaintiffs in error to cross-examine. At the time of the second trial Arthur, who had been a witness at the first trial, was dead, and his testimony was read on behalf of The Consolidated Plaster Company. In addition, it appears that entries made in his diary were also admitted in evidence. The latter were objected to by plaintiffs in error. In the circumstances of this case we do not deem it necessary to determine whether or not the court erred in refusing counsel to cross-examine Auld, or in admitting the diary entries of Mr. Arthur, deceased, for the reason that the testimony on the part of Mr. Wild relating to his actions, and what was contained in his communications to the officers of the plaintiff company, so clearly and conclusively established every controverted issue of fact made by the pleadings, that it is apparent the judgment could not have been otherwise than it was, so that if the court erred in the particulars contended, it was without prejudice to the rights of either plaintiff in error. Non-prejudicial error will not work a reversal of a case brought here for review.

We shall next consider the questions urged particularly by counsel for The Buckhorn Plaster Company. On its behalf it is contended that the original written agreement entered into between Wild and The Consolidated Plaster Company did not operate to pass to the latter a lease-hold interest in the Wild mill or to create, so far as that building was concerned, the relationship of landlord and tenant. In support of this contention it is urged that the usual elements of a lease are missing, because there was no rent or other compensation provided for the use of the mill, nor was there any stipulated rent for the

lease upon the gypsum land, and that the company did not agree to work the quarry or remove a single ton of rock.  A lease, like every other contract, must be supported by a good and sufficient consideration, but the consideration may be paid in whole at the inception of the term.  That was what was done under the contract between Wild and The Consolidated Plaster Company.  He received as a consideration for such contract, one-fourth of the capital stock of the company.  For this consideration, he leased the mill and the gypsum land, with the further proviso that he should be paid a royalty for rock taken therefrom and used in the manufacture of plaster.

The lease further provided that the plaster company might discontinue the use and operation of the mill at any time, and that when it did cease to operate the mill, Wild might do so on his own account.  It is claimed that by this provision the contract was not a lease of the mill, but a contract for its use from time to time, at the option of the plaintiff company.  The agreement merely provided that Wild might use the plant for certain purposes when the company did not desire to carry on operations, but when it did, it had the absolute right to operate the mill, and when it did so, its possession was sole and exclusive.  This is the right which Wild, by his action, has attempted to invade.  In construing a contract, the court will follow the construction placed upon it by the parties themselves.  Under the agreement referred to, the plaintiff company entered into the possession of the disputed premises, and operated the mill.  Wild never questioned its right to do so until he took steps looking towards ousting the company of its rights, and when he did, he recognized that theretofore the company had been operating the mill under a lease.

The Buckhorn Plaster Company purchased and

(34)

went into the possession of the new Buckhorn mill
in May, 1906. About six months later, this mill was
destroyed by fire, and counsel for The Buckhorn
Plaster Company contend that this terminated the
lease between Mr. Wild and the plaintiff company.
The Buckhorn Plaster Company, after the destruc-
tion of the mill covered by the lease, constructed a
new mill practically on the site of the one that was
burned. The new structure was erected at an ex-
pense of between thirty and thirty-five thousand dol-
lars. Seven thousand dollars insurance on the mill
burned was collected. The old machinery was sold
for something like eight hundred dollars, and a
crusher from the mill burned was used in the new
one. The Buckhorn Plaster Company had the bene-
fit of the money thus realized, and the crusher put
into the new structure, property upon which the plain-
tiff company had a lease which would not expire for
several years. Most of the cases presenting the ques-
tion for consideration have arisen where, after the
destruction of the leased building, the lessee has
sought to be relieved from his covenant to pay rent.
In the case at bar, the question is unique in this
respect—that it is a lessee that has paid rent in ad-
vance to the end of the term, insisting that the de-
struction of the mill has not terminated its contract
with Wild. It seems to have been the doctrine of
the common law that rent issued out of the land itself,
regardless of the buildings thereon, and hence, the
destruction of the buildings on the leased premises
did not discharge the obligation of the tenant to pay
rent for the full term of the lease, unless so stipu-
lated. The reason for holding the tenant liable for
rent in such circumstances was, that the land was still
in existence. The tenant had the exclusive right to
occupy it. The landlord had no right to re-enter for
the purpose of rebuilding. The tenant could rebuild

if he saw fit; and hence, he must be regarded as still holding the land, and therefore, liable for rent.— McAdam L. & T., § 198. From this doctrine there has been formulated the rule, that if by the lease the lessee is demised the land upon which the improvements stand, the destruction of the latter does not terminate the lease unless it is so agreed.—*Lanpher v. Glenn*, 37 Minn. 4; *Graves v. Berdan*, 26 N. Y. 498.

The test, then, to apply in the case at bar is, whether the land upon which the new Buckhorn mill was located was demised by Wild to the plaintiff company. Leases must be construed according to the intention of the parties, and with reference to the subject-matter.—*Kerr v. Merchants' Exchange Co.*, 3 Edw. Ch. 333.

By the original lease executed by Wild, he leased to the plaintiff company his mill "and the land whereon the same is situated, to wit, a tract of land one hundred feet square," located on a specified government subdivision. It did not provide that it was to terminate in the event the mill was destroyed.

From the testimony bearing on the terms and conditions under which the new Buckhorn mill was constructed, it appears, without question, that the new plant was to take the place of the old, and was to be covered by the terms of the old lease in all respects, which at that time had fifteen or sixteen years to run; in short, that the new structure was to take the place of the old Buckhorn mill, under the written lease thereon. The plaintiff company expended several thousand dollars in erecting the new mill. In consideration of the new lease, Mr. Wild was released from all obligations under the lease which he had executed on the Wild mill, and was reinvested with the full control of that structure. The company had paid Wild in advance the rent agreed upon for the full term of the lease. When the new

arrangement was made the lease had upwards of fifteen years to run. From these undisputed facts we think it is clear that by the oral agreement entered into the lease upon the new structure was to be the same as on the old, which included a specified grant of the land upon which the former was located; and hence, under the authorities, the destruction of the mill did not terminate the lease. But, aside from this, the general rule is, that the grant of an entire structure carries with it the land upon which it is located.—*Whitney v. Olney,* 3 Mason (R. I.) 280; *Lanpher v. Glenn, supra; Rogers v. Snow,* 118 Mass. 118; *Maddox v. Goddard,* 15 Me. 218; *Bacon v. Bowdoin,* 22 Pick. 401; *Winchester v. Hees,* 35 N. H. 43; *Sheets v. Selden's Lessee,* 2 Wall. 177.

In the case at bar, The Consolidated Plaster Company was the sole lessee. It was granted the exclusive right to occupy the mill when it so desired. Under this arrangement the land upon which the structure was located passed by virtue of its agreement with Wild, even though such land was not expressly mentioned.

At the time The Buckhorn Plaster Company purchased the premises in controversy, the writ of error to the original judgment had been sued out, and the case was pending in this court. It bought with actual knowledge that such proceedings were pending. An appeal had been prayed originally, but was never perfected, nor was the writ of error subsequently sued out made to operate as a *supersedeas.* In these circumstances counsel for The Buckhorn Plaster Company contend that in as much as at the time it purchased Wild was in the possession and enjoyment of his property, and a judgment of record was in existence, in his favor, that the company, even though the writ of error had to its knowledge been sued out in good faith, bought the property and ac-

quired a good title, irrespective of the final outcome of the proceedings in error. A purchaser of realty with actual notice of the pendency of proceedings involving the title is as conclusively bound by the results of the litigation as if he had, from the outset, been a party thereto.—*Tilton v. Cofield,* 92 U. S. 163.

Our code provision, sec. 36, even if it should be construed to apply to proceedings pending in this court (a question upon which we express no opinion), does not create the law of *lis pendens,* but imposes limitations upon the common law on the subject.— *Empire Land Co. v. Engley,* 18 Colo. 388. It provides that only from the time of filing the notice of *lis pendens* shall the pendency of an action involving title to realty be constructive notice of such suit to a purchaser or encumbrancer of the property involved. Failing to file such notice, however, does not relieve persons who have actual notice of the pendency of the action.—Bennett *Lis Pendens,* § 320; *Brown v. Cohn,* 60 Am. St. Rep. 83, 95 Wis. 80; Note to *Stout v. Mng. Co.,* 56 Am. St. Rep. 843 (856).

The Buckhorn Plaster Company may have expended several thousand dollars in erecting the new mill, but having purchased the premises with actual notice of the claim of the plaintiff company, it made these improvements at its peril, and subject to the rights of the plaintiff company if it prevailed.— *Davis v. Farwell Co.,* 49 S. W. (Texas) 656; *Patterson v. Brown,* 32 N. Y. 81; *Haven v. Adams,* 90 Mass. 363.

The judgment of the district court is affirmed. Decision *en banc.*                    *Affirmed.*

Mr. JUSTICE CAMPBELL not participating.

Mr. JUSTICE HILL, though hearing the oral argument, did not participate in the decision.

Opinion filed February 7, A. D. 1910; rehearing denied April 4, A. D. 1910.