No. 20,683.

PUBLIC SERVICE COMPANY OF COLORADO *v.* CITY AND COUNTY OF DENVER, ET AL.

(387 P. [2d] 33)

Decided November 4, 1963. Rehearing denied December 16, 1963.

Messrs. LEE, BRYANS, KELLY & STANSFIELD, Mr. ROBERT S. GAST, JR., for plaintiff in error.

Mr. ROBERT S. WHAM, for defendants in error City and County of Denver, and Frank K. Southworth.

Messrs. Gorsuch, Kirgis, Campbell, Walker and Grover, for defendant in error Thomas G. Currigan.

*En Banc.*

Mr. Justice Moore delivered the opinion of the Court.

The parties to this action are as follows: Public Service Company of Colorado, plaintiff in the trial court, to whom we will refer as the Company; City and County of Denver, a defendant in the trial court, hereinafter referred to as the city; Thomas G. Currigan, City Auditor and a defendant in the trial court, hereinafter referred to as the Auditor; Frank K. Southworth, Manager of Revenue and a defendant in the trial court, to whom we will refer as the Manager. The gas consumers in the city who are customers of the Company will be referred to as consumers.

The Company brought suit in the district court against the above named defendants to recover moneys allegedly paid in excess of the sums legally due under the provisions of the franchise under which the Company serves consumers of gas within the city. The Auditor filed an answer in which he set forth equitable and legal defenses, which we find unnecessary to incorporate herein in detail. He also filed a counterclaim against the Company to recover for the city certain moneys allegedly due under the franchise by reason of an asserted improper deduction by the Company of $48,694.52 as a set-off against the amount due according to a quarterly report of the Company under the terms of the franchise. This deduction was made by the Company in October 1955, under a claim that it had overpaid the city for the period between August 1952 and December 1953. The Manager and the city filed an answer in which they supported the claim of the Company. They acknowledged, in their brief "* * * that there are substantial questions of

law with respect to the matters raised in the litigation and ask the Court to adjudicate the rights of the parties."

Pursuant to a vote of the taxpaying electors of the city an ordinance granting a gas and electric franchise to the Company became effective February 14, 1947, the provisions thereof which are pertinent to this controversy are as follows:

"Section XIII. As a further consideration of this franchise, and in lieu of all occupancy and license taxes or other taxes on the right to do business, the Company agrees to pay a sum equal to three per cent (3%) on the gross revenue derived from the sale of electrical energy by the Company within the corporate limits of the City and County of Denver, and a sum equal to three per cent (3%) on the gross revenue derived from the sale of gas by the Company within the corporate limits of the City and County of Denver.

"The term 'gross revenue' as used herein shall be construed to mean any revenue earned within the City and County of Denver from the sale of electrical energy and gas, after adjustment for the net write-off of uncollectable accounts and corrections of bills theretofore rendered . . .

"The Company shall file with the Manager of Revenue a report of its gross revenue within forty-five days after the close of each quarter in each calendar year. Such report shall contain a statement of the gross revenue classified according to the rate schedules then in force and effect and a statement of any deductions made because of adjustments and corrections as herein provided, together with a computation of the tax to be paid. Coincidentally with the filing of such reports, the Company shall pay to the Manager of Revenue the tax thus computed. Within thirty (30) days from the date filed, or within such additional time as the Manager of Revenue may request, the Manager of Revenue shall investigate the report and determine the accuracy of the amounts reported. However, neither payment of the tax nor a failure to make

such investigation shall be deemed to estop the City in any way or prevent subsequent investigations by the City and collection of any amount due. If the tax paid is found to be insufficient, the Manager of Revenue shall notify the Company of the deficiency and demand payments of said amount. If the tax paid is determined to be excessive, the Company shall be entitled to a refund of the excess paid."

The controversy arises by reason of four increases in rates made by wholesalers of gas to the Company for re-sale to its consumers. These increases in rates were authorized by the Federal Power Commission as a temporary matter. The Public Utility Commission of Colorado authorized the Company to pass the increased cost on to its consumers. This increase in rates charged the consumers by the Company necessarily included the item of increased payments to the city occasioned by the higher "gross revenue" as defined in the franchise. The Federal Power Commission subsequently cancelled the increase in wholesale rates which had been previously authorized and ordered the wholesalers to refund to the Company the exact amount which had been collected thereunder by the wholesalers. The Public Utilities Commission thereupon ordered the Company to refund to its consumers the amount refunded by the wholesalers, and characterized the refund as moneys held in trust by the Company for the benefit of its consumers. The function of the Company under the order of the Public Utilities Commission was to serve as a conduit through which the refunded moneys should flow from the wholesalers to the consumers. A carefully prepared formula was agreed upon, based on sample months and averages rather than on an individual customer by customer charge of individual bills for the period involved. All the expenses of the Company involved in the distribution of the money to the consumers were paid as a charge upon the trust funds.

January 7, 1960, the Company filed its claim with the

Auditor for $249,795.26, asserting that this amount was due it for the reason that an overpayment in that amount had been made under the terms of the franchise for the years 1954 to 1958—all brought about by the cancellation of the rate increases which were "temporarily" in effect during those years. (The figure above mentioned was the balance allegedly due after the Company had set off the $48,694.52 to which reference has already been made.) June 11, 1962, the Company filed its claim with the Auditor for an additional refund of an alleged similar overpayment of moneys due the city under the franchise for the 1958 to 1960 period, in the amount of $149,406.88.

All pertinent facts were stipulated and the trial court entered judgment upon motion for summary judgment. The trial court denied the Company's claims as to the $249,795.26 and $149,406.88, and granted the Auditor's counterclaim against the Company for $48,694.52. The Company is here by writ of error directed to this judgment.

The Company and the city must find justification for their respective positions within the four corners of the franchise, which is the contract between them and by which they are bound. Said document was finalized after lengthy negotiations, action by the city council, and approval by the qualified voters of the city. An examination of this franchise agreement discloses a well prepared and comprehensive statement of the rights, duties and obligations of the parties thereto. The language employed is clear and expresses an intent which is not clouded by ambiguities.

In considering public utilities franchise agreements the courts are bound to give a liberal construction in favor of the municipality in the protection of the public. The general rule in this connection is stated in 63 C.J.S. 605 as follows:

"However, such contracts, while relating to the business interests of the city, are not of a private nature, but are of public concern and amenable to the rules of law

applicable to public utilities, one of which is that the grant of a public utility franchise is to be liberally construed in favor of the public; * * *"

We now consider the question of whether the Company is entitled, under the terms and conditions of the contract and the facts hereinabove stated, to recover the $399,201.94 represented by the claims filed with the Auditor.

Pursuant to the provisions of the franchise contract hereinabove quoted, the Company "* * * filed a report of its gross revenue within forty-five days after the close of each quarter in each calendar year * * *" for all the years involved in the litigation. Each of these quarterly reports did, "* * * contain a statement of the *gross revenue classified according to the rate schedules then in force and effect* and a statement of any deductions made because of *adjustments and corrections as herein provided* together with a computation of the tax to be paid." (Emphasis supplied.)

In all of these reports there was no mention of any refund received, claimed, or contemplated in the future. The amount paid for each quarter was the correct sum owed to the city under "the rate schedules then in force and effect." No "adjustment for the net write-off of uncollectable accounts and correction of bills theretofore rendered" is involved for the reason that the Company became a holder of the refund from the wholesalers in trust for the use and benefit of its consumers, and for the further reason that in serving as a conduit for the return of funds to the consumers the process did not involve a "net write-off of uncollectable accounts and correction of bills theretofore rendered." It is admitted that the consumers received a refund "based on sample months rather than an individual customer by customer charge of individual bills for the period."

The gross revenue on which the Company paid its franchise assessment was in fact the gross volume the Company actually received during each quarter of the

period involved. The fact that thereafter the Company served as a conduit for trust funds for the consumer did not increase or decrease the "gross revenue" theretofore received by the Company. Generally the term "gross revenue" means gross receipts of a business before deductions for any purpose except those items specifically exempted. *State Tax Commission v. Quebedeaux Chevrolet,* 71 Ariz. 280, 226 P. (2d) 549. The refunds from the wholesalers to the Company in trust for the benefit of consumers were not items "specifically exempted" under the franchise agreement. It should require the citation of no authorities to support our conclusion that the rights of parties to a contract clear, complete and unambiguous, should be determined according to the express provisions of said contract. In the instant case we have such a contract, which must be liberally construed to protect the public interest, prepared by experts after long negotiation, approved by city council and the vote of the people. We have no right to change this contract, or, by interpretation of that which is clear, make a new or different contract for the parties.

The argument is made that the claims of the Company should be paid because the "overpayments" were made under a mistake of fact. With this assertion we cannot agree. The Company paid each quarterly installment during the time the increased rates were in effect, with full and detailed knowledge of all existing facts. The most that can be said is that a change in the situation developed at a much later date. Under well established principles of law this is not sufficient to justify relief on the ground of "mistake of fact." From 40 Am. Jur. § 192, p. 847, we quote the following:

"A mistake, to be available as a ground for recovering money paid, must be as to an existing fact; therefore, where the subjects in relation to which the contract of parties is made are known by them to be of an uncertain and speculative character or value, a mere mistake by them in their estimate of the value is not deemed suffi-

cient to authorize a recovery of the moneys paid on the erroneous estimate. \* \* \*"

█ There was no error or mistake in the amount reported and paid by the Company, the report and payment was the Company's voluntary action within the express terms of the franchise; the city did nothing but receive the reports and payments, both the reports and payments were absolutely correct when made (so far as the later refund is concerned), according to "the rate schedules then in force and effect." The later refund was exactly the amount which the Company received from the wholesalers and left the Company exactly where it was when the reports and payments were made. This refund to the Company did not include the increase to the consumer with relation to the franchise assessment of 3% brought about by the increase in gross revenues. Presumptively, the Company covered all their increased costs of operation in their request for higher rates. They accordingly received from the consumers the amount required as franchise assessment to cover the increase in gross revenues. The refunds had no financial effect upon the Company.

We next consider the question of whether under the counterclaim of the Auditor the city was entitled to recover the $48,694.52 which the Company in October 1955 had set off and deducted from its tax payment for the period between August 1952 and December 1953. Here again the answer is to be found within the terms of the franchise contract. The procedure to be followed by the city to question the correctness of any report and payment by the Company is clearly stated in the franchise as follows:

"Within thirty (30) days from the date filed or within such additional time as the Manager of Revenue may request, the Manager of Revenue shall investigate the report and determine the accuracy of the amounts reported."

The Manager of Revenue did not within thirty (30)

days "determine the accuracy of the amounts reported." He did nothing to question the accuracy of the reports or the amount paid. He has taken the position at all times that the offset was proper. Not until the Auditor was sued and filed his counterclaim was the report and payment challenged. This was more than six years after the report was filed and payment made. The counterclaim must fail under the express terms of the franchise, the granting of which franchise by the city was "the exertion of the proprietary power of the sovereign." *Berman v. City and County of Denver, et al.,* 120 Colo. 218, 209 P. (2d) 754. In *City of Denver, et al., v. Mercantile Trust Company of New York,* 201 Fed. 790, the court stated at page 803:

"Again, in the matter of granting authority to street railways to operate lines of roads in the City, the City of Denver was exercising its proprietary, as distinguished from legislative or governmental authority, and in respect to the exercise of its proprietary powers the city is bound by the same rule of equitable estoppel as individuals."

 By the franchise agreement the procedure to be followed by the city in challenging the correctness of reports by the Company was specifically stated, and more than six years elapsed before anyone challenged the correctness of the reports in question, and when objection was made it was made by the Auditor who has no authority to prosecute any claim for and on behalf of the City and County of Denver. The city has never at any time made a claim against the Company for any sum whatever. Conditions necessarily precedent to the right of the city to recover the sum here under discussion have not been performed. The statute of limitations has long since expired and the judgment entered by the trial court on the counterclaim of the Auditor cannot be upheld.

The judgment of the trial court denying the claims of the Company is affirmed; the judgment awarding the

sum of $48,694.52 in favor of the city and against the Company is reversed with directions to dismiss the counterclaim of the Auditor.

MR. JUSTICE HALL and MR. JUSTICE McWILLIAMS dissent.

MR. JUSTICE HALL dissenting:

I dissent to that part of the decision of the majority that affirms the judgment of the trial court and concur in that part of the decision which disallows the counterclaim of Currigan. My concurrence is not for the reasons assigned by the majority, but for the reason that Denver is not entitled to receive or retain a percentage of money not earned as gross revenue and lawfully refunded by Public Service Company to its customers.

For brevity and convenience I refer to the Public Service Company of Colorado as "Public Service"; to the City and County of Denver as "Denver"; to Currigan by name or as "the Auditor"; to the Federal Power Commission as "FPC"; to the Public Utilities Commission of the State of Colorado as "PUC," and to Colorado Interstate Gas Company as "Interstate."

In the majority opinion I find some statements of fact that in my opinion are not borne out by the record. I also find some argumentative conclusions that in my opinion are unwarranted when considered in the light of the record.

In the majority opinion it is stated:

"* * * The Manager and the city filed an answer in which they supported the claim of the Company. [This is correct.] They acknowledged in their brief '* * * that there are substantial questions of law with respect to the matters raised in the litigation and ask the Court to adjudicate the rights of the parties.' "

More important than what Denver says in its brief is what it says in its answer. We review cases on the record before us, that which the trial court had before

it, rather than on statements in briefs which the trial court has never seen.

The answer of the manager and Denver, a part of the record before us, contains the following language:

"These answering defendants further allege *that the refusal of the Auditor* as hereinabove alleged *has raised substantial questions of law and fact which should be determined by this Court.*" (Emphasis supplied).

At first blush, it may appear that there is no substantial difference between the two quotes. As I view the matter, there is a vast difference, for Denver, according to the record before us, at all times has steadfastly, including June 16, 1963, the date on which the case was orally argued here, maintained that Public Service, under the terms of the franchise, was and is entitled as a matter of fact and law to the refund demanded.

Denver, in its answer, posed no question of fact or law to be adjudicated. According to Denver's answer, Currigan

"* * * was advised by opinion number Am-43 of the City Attorney for the City and County of Denver, that the claim of plaintiff referred to at paragraph 17 of the First Claim, was valid and should be paid, but that said Auditor notwithstanding such advice refused to pay the same."

Denver should not be charged with opposing the position of Public Service when in truth only Currigan is in disagreement therewith.

The majority opinion states that:

"The controversy arises by reason of four increases in rates made by wholesalers of gas to the Company for resale to its consumers. [This is correct]. These increases in rates were authorized by the Federal Power Commission as a temporary matter. * * *. The Federal Power Commission subsequently cancelled the increase in wholesale rates *which had been previously authorized* * * *." (Emphasis supplied.)

I find nothing in the record to sustain the last two sentences of this quotation.

The first of these four rate increases was initiated by Interstate on September 2, 1953, by filing with FPC — Docket No. G-2260 — new schedules providing for increased rates to be charged to its customers, including Denver, and giving the statutory required thirty days' notice of its proposal to, after the expiration of said thirty days, make charges under the new rates. Contrary to its usual procedures of suspending the effective date of proposed new rates for the maximum period of five months after the proposed effective date, FPC suspended the new rates only until January 1, 1954, all as provided by the 1938 Federal Natural Gas Act, as amended.

The second rate increase was initiated by Interstate on July 30, 1954 — FPC Docket No. G 2576. On August 26, 1954, FPC suspended this increase until February 1, 1955.

The third rate increase was initiated by Interstate on December 16, 1956 — FPC Docket No. G 11717. On January 10, 1957, FPC entered its order suspending said increase until July 1, 1957.

The fourth increase was initiated by Interstate on September 19, 1957 — FPC Docket No. G 13541. On October 18, 1957, FPC suspended this new rate until February 5, 1958.

Procedures followed with reference to the second, third and fourth increases were the same as those followed in the first case.

Revenues derived by Interstate because of these increases in rates were subject to refund to its customers, provided that on final determination by FPC they were found to be unreasonable.

On December 30, 1958, FPC determined that none of the four increases by Interstate was justified. It directed Interstate to refund to its customers all amounts collected in excess of the old rates, together with interest.

Pursuant to such order, Interstate refunded to Public Service $16,151,296.45.

From the foregoing it must be abundantly clear that FPC did not authorize "as a temporary matter" or at all any of the four increases. It ordered each increase suspended, eventually cancelled all of them, and ordered all monies collected by virtue of the increases refunded to those from whom collected.

Clearly the revenues derived by Interstate by virtue of each increase were at all times refundable and were eventually refunded to its customers, including Public Service.

In the majority opinion it is stated that:

"* * * The Public Utility Commission of Colorado authorized the Company to pass the increased cost on to its consumers. [This is correct]. This increase in rates charged the consumers by the Company *necessarily included the item of increased payments to the city* occasioned by the higher 'gross revenue' as defined in the franchise. * * *." (Emphasis supplied.)

* * *

"* * * This refund to the Company did not include the increase to the consumer with relation to the franchise assessment of 3% brought about by the increase in gross revenues. [Correct.] *Presumptively, the Company covered all their increased costs of operation in their request for higher rates. They accordingly received from the consumers the amount required as franchise assessment to cover the increase in gross revenues.* * * *." (Emphasis supplied.)

I find nothing in the record before us which in my opinion warrants the foregoing argumentative conclusion, bolstered by a presumption of the majority. The record is replete with words which lead me to conclude that only increased costs of gas were passed on to the consumers, and in the first case only 83⅓% of the increased cost of gas, and that the foregoing conclusion and presumption do violence to the record before us.

Let's look at the record. On December 28, 1953, Public Service filed the first of its four applications for "an emergency gas rate adjustment, being a temporary * * * gas rate adjustment." Public hearing was had before the Commission (Docket No. 361) on December 28, 1953. At that hearing Denver was represented by its then City Attorney, Currigan's present counsel was there representing himself, the City of Fort Collins and the Colorado Municipal League. On January 7, 1954, PUC entered its Decision No. 41845, consisting of STATEMENT, FINDINGS and ORDER. Therein it is stated:

"* * * It is apparent that the emergency gas rate adjustment sought by the Company herein has been precipitated by the increase in rates for gas furnished to the Company * * * by * * * Colorado Interstate Gas Company * * *.

\* \* \*

"The impact on the Company of the increase in the rates * * * is that during the year 1954, the increase in the cost of gas purchased by Public Service Company of Colorado from said suppliers will amount to $2,097,000.00.

\* \* \*

"Secondly, it appears to this Commission that the Company [Public Service] has made a prima facie showing that neither the Company as a whole nor the gas department alone can absorb the total increase in the cost of gas purchased for re-sale by the Company amounting to $2,097,000.

\* \* \*

"That the Company be, and it hereby is, authorized to file a new temporary rider to its tariff, Colo. PUC No. 3-Gas, designed so that the Company will absorb 16⅔% of the estimated increase to it of the cost of gas based on the 1954 estimates.

\* \* \*

"That Public Service Company of Colorado be, and it

hereby is, ordered to pass on to its customers their proportionate share of any refund due to said customers as a result of the final settlement of the gas rates in FPC Docket No. 2260 and FPC Docket No. 2261, in the manner to be later approved by the Commission."

Clearly the foregoing provides for an increase in rates predicated entirely on a percentage of the added cost to Public Service of gas by it purchased from Interstate and sold to its customers. I find nothing in this order to warrant a conclusion that the authorized rate increase included franchise taxes or any item of operating cost other than the cost of gas.

Similar procedures were followed with the second rate increase initiated by Public Service on January 10, 1955. Public hearing was had on the application, at which Denver was represented by its attorney, and at which Currigan's counsel appeared as counsel for the Colorado Municipal League.

On January 27, 1955, the Commission made its Decision No. 43942, wherein it disposed of this application of Public Service. In its STATEMENT, FINDINGS and ORDER, among other things, appears the following:

"* * * *Applicant in this proceeding simply seeks to be allowed to recover an amount necessary to offset its increased cost of gas,* and to do this Applicant proposes to put into effect an emergency gas rate adjustment * * * to remain in force and effect until final determination is made by the Federal Power Commission of the proposed rates and charges of Colorado Interstate and Colorado-Wyoming. * * *." (Emphasis supplied.)

With reference to the third rate increase, Public Service, on May 24, 1957, filed its application for an additional "emergency," "temporary" increase necessitated by a third increase in its cost of gas imposed by Interstate. PUC followed procedures as in the previous hearings. Denver was represented by its attorney. On June 21, 1957, PUC made its Decision No. 48257, and in its

STATEMENT, FINDINGS AND ORDER, among other things, stated:

"Testimony introduced at the hearing by Applicant indicates that the total increase in revenues resulting from the aforesaid proposed emergency gas rate adjustment is estimated to be an amount which is approximately equivalent to the estimated increase in the cost of gas purchased by Applicant from Colorado Interstate and Colorado-Wyoming for resale.

\* \* \*

"\* \* \* Applicant in this proceeding simply seeks to be allowed to recover an amount necessary to offset its increased cost of gas, and to do this Applicant proposes to put into effect an emergency gas rate adjustment to be published as a temporary rider to its Tariff to remain in force and effect until final determination is made by the Federal Power Commission of the proposed rates and charges of Colorado Interstate and Colorado-Wyoming. \* \* \* \*"

With reference to the fourth increase, procedures followed were essentially, if not exactly, the same as those followed in the three previous cases. Denver was represented in this fourth hearing. On February 3, 1958, the Commission entered its Decision No. 49595, and stated:

"\* \* \* Applicant in this proceeding simply seeks to be allowed to recover an amount necessary to offset its increased cost of gas if its suppliers' proposed increased rates become effective, and, subject to such contingency, to do this Applicant proposes to put into effect emergency gas rate adjustments to be published as temporary riders to its Tariff to remain in force and effect until final determination is made by the Federal Power Commission of the proposed rates and charges of its three suppliers in the FPC proceedings mentioned above. \* \* \*."

In addition to the foregoing there appears in the record the written stipulation of the parties to this litigation, including Currigan, wherein appears the following:

"\* \* \* Concurrently with said pipeline rate increase,

*plaintiff sought and obtained from the Public Utilities Commission of the State of Colorado, by Decision No. 49595* [the other rate increases are not involved here], *dated February 3, 1958, authority to increase its gas rates to the ultimate consumers in amount estimated to reflect the increased cost of gas to plaintiff.* In said order of the Public Utilities Commission of the State of Colorado, the Commission retained jurisdiction of the subject matter thereof for the purpose of making such orders as might be necessary or required at the time of the final determination of the wholesale pipeline rates as finally approved by the Federal Power Commission. * * *." (Emphasis supplied.)

Here we have a stipulation of the parties which in my opinion completely refutes the "conclusion" made and the "presumption" indulged in by the majority, to the effect that the consumers were charged with the increased cost of gas and, in addition, 3% of such increase.

In the majority opinion are the following statements:

"* * * The function of the Company [Public Service] under the order of the Public Utilities Commission [PUC] *was to serve as a conduit through which the refunded moneys should flow from the wholesalers to the consumers.* * * *.

\* \* \*

"In all of these reports there was no mention of any refund received, claimed, or contemplated in the future. The amount paid for each quarter was the correct sum owed to the city under 'the rate schedules then in force and effect.' No 'adjustment for the net write-off of uncollectable accounts and correction of bills theretofore rendered' is involved for the reason that the Company became a holder of the refund from the wholesalers in trust for the use and benefit of its consumers, *and for the further reason that in serving as a conduit for the return of funds to the consumers* the process did not involve a 'net write-off of uncollectable accounts and correction of bills theretofore rendered.' * * *

"The gross revenue on which the Company paid its franchise assessment was in fact the gross volume the Company actually received during each quarter of the period involved. *The fact that thereafter the Company served as a conduit for trust funds for the consumer did not increase or decrease the 'gross revenue' theretofore received by the Company. * * *.*" (Emphasis supplied.)

It is true that the refund monies received by Public Service from Interstate were by PUC characterized as "basically trust funds." Neither Interstate nor PUC has dubbed Public Service a conduit. Only the majority opinion has done that and, in my opinion, nothing in the record warrants such characterization.

If Public Service did serve "as a conduit through which the refunded moneys should flow from the wholesalers to the consumers," it was certainly a very active conduit as distinguished from most if not all other conduits which are lacking in mobility, planning, proposing, contesting, or any *activity*.

From the record it appears that Public Service received some sixteen millions of dollars from Interstate. This money represented overcharges made for gas supplied. It was money which FPC ordered Interstate to pay to Public Service. On payment of this money Interstate had discharged its duties imposed by FPC, it had discharged its contractual duties with Public Service, and it was through.

Interstate had no business with Denver, Public Service customers, or the PUC insofar as the matters here involved were concerned. It had to make the refund to Public Service unconditionally and with no strings attached. It made the refund to Public Service, a corporation; it did not deliver the money to Public Service in trust for others.

The refund monies received by Public Service became "basically trust funds" by virtue of proposals made by Public Service to PUC, and orders of PUC allowing Pub-

lic Service to increase its rates to its customers, in which orders it is stated:

"Applicant proposes * * * any moneys refunded to Applicant resulting from application of the rates for natural gas as finally determined by the Federal Power Commission, shall be subject to refund to Applicant's customers in a manner to be approved by this Commission."

The foregoing proposal was certainly one of the reasons for PUC's approval of the application of Public Service for increased rates. Thus it would appear that Public Service was not acting as a conduit between Interstate and its customers—rather it had received monies from Interstate which it had previously, by way of inducement to have PUC grant it increased rates, promised to refund to its customers.

From the record it appears that Public Service on receipt of refunds from Interstate on its own initiative invested the monies received in short-term legal investment securities; it prepared and submitted to PUC a plan for making refunds; it (without success) urged PUC to permit it to retain 16⅔% of the refund on the initial increase, which 16⅔% PUC had made Public Service absorb; it attended hearings before PUC, employed "The Service Bureau Corporation" "to conduct the actual refunding operation"; which operation involved the writing of over 550,000 checks, and after the expiration of 180 days, the deadline fixed for claiming refunds, it turned over to Denver unclaimed refunds then it its possession in the amount of about $250,000.00.

From the record I conclude that Public Service had in its possession certain funds that it had previously offered to refund to its customers, funds which it had previously been ordered to refund to its cutsomers. It did that which it had agreed to do, that which it had been ordered to do. Whether it was serving as a conduit or as a trustee is, in my opinion, of no moment, though in the majority opinion it being three times stressed that Public Service

was serving as a conduit, it would seem to loom large and may be the rationale of the majority in resolving the problem presented. The refunding operation was completed in a manner satisfactory to everyone, and the refunding operation whether through a conduit, trustee, or otherwise, has nothing to do with the resolution of the questions before us.

I agree with the statement of the majority that:

"The Company and the city must find justification for their respective positions within the four corners of the franchise, which is the contract between them and by which they are bound. * * *."

In commenting on this contract, the majority characterizes it as: "* * * a well prepared and comprehensive statement of the rights, duties and obligations of the parties thereto. The language employed is clear and expresses an intent which is not clouded by ambiguities."

\* \* \*

"* * * a contract clear, complete and unambiguous, should be determined according to the express provisions of said contract. In the instant case we have such a contract, * * *. We have no right to change this contract, or, by interpretation of that which is clear, make a new or different contract for the parties."

In my humble opinion it is not the function of courts to construe language that is "clear, complete," and "not clouded by ambiguities," but rather to accept the words used and give to such words their plain and literal meaning.

In 12 Am. Jur. 752, Contracts, § 229, it is said:

"* * * Where the terms of a writing are plain and unambiguous, there is no room for construction, since the only office of judicial construction is to remove doubt and uncertainty. * * *.

"It is commonly said that where a contract is plain and unambiguous, its meaning should be determined without reference to extrinsic facts. Similarly, it is said

that where there is no ambiguity in the language used in a contract, the intention of the parties must be gathered from that and from that alone."

It is further stated in 12 Am. Jur. 745-746, Contracts, § 227: "Generally speaking, the cardinal rule in the interpretation of contracts is to ascertain the intention of the parties and to give effect to that intention if it can be done consistently with legal principles. * * *."

The majority, having taken the position that the contract is clear, complete and unambiguous, and consequently not subject to construction, forthwith proceeds to construe the contract, using the following language:

"In considering public utilities franchise agreements the courts are bound to give a liberal construction in favor of the municipality in the protection of the public. * * *."

\* \* \*

"* * * In the instant case we have * * * a contract, which must be liberally construed to protect the public interest, * * *."

It is essential in determining the rights and duties of parties to a contract that one know what the parties intended. Some contracts are inarticulately drafted, words used are of obscure or indefinite meaning, there are omissions and lack of completeness so that the intent of the parties is not clearly or completely stated. Such contracts, when the parties are in disagreement as to the meaning of words used, require interpretation or construction to determine the true intent of the parties.

We do not have such a contract here.

The only parties to the contract before us are Denver and Public Service; they are not in disagreement as to the contract or its meaning, or of the meaning of any word or group of words therein contained. The contracting parties agree that they intended that Denver should receive and retain three percent of *gross revenues* derived from the sale of gas. However, they saw fit by their

contract to clarify and limit the meaning of the words gross revenue" by stating:

"* * * 'gross revenue' as used herein shall be construed to mean any *revenue earned* * * * from the sale of * * * gas * * *." (Emphasis supplied.)

Denver and Public Service are in agreement that the refundable increased charges authorized by PUC, exacted by Public Service and refunded to the customers were not *earned gross revenue.*

Had the refundable increases been earned, they would have been the monies of Public Service and their ownership constitutionally protected against raids by anyone.

In spite of the fact that the parties defined *gross revenue* as above set forth, the majority comes forth with its own definition, which in my opinion does violence to and cannot be reconciled with the contracting parties' definition.

The majority states that: "* * * Generally the term 'gross revenue' means gross receipts of a business before deductions for any purpose except those items specifically exempted. *State Tax Commission v. Quebedeaux Chevrolet,* 71 Ariz. 280, 226 P. (2d) 549. * * *."

The foregoing may be a good definition, suitable to the Supreme Court of Arizona and the litigants appearing before that court, but that definition is not the one chosen by Public Service and Denver.

Clearly the parties to the contract had the right to define "gross revenue." This they did, and in so doing precluded others, including Currigan, from ignoring the word "earned" and ascribing to the two words—gross revenue—a meaning incompatible with the clearly expressed intention of the parties.

Surely we must accept the parties' expressed meaning of the words and cast aside other inconsistent meanings.

The majority opinion wholly ignores the parties' expressed construction of the meaning of the words "gross revenue." The revenue mentioned and on which Public Service contracted to pay a tax of three percent was

not only *gross revenue,* but *earned gross revenue.* The word *earned* is meaningful, it is an integral part of the contract, it cannot be dropped or ignored. It goes to the very heart of the problem here presented.

Thus it is manifest that Public Service was supposed to pay and Denver receive three percent of the *gross earned revenue* or, as otherwise stated, three percent of the *gross revenue earned.*

Were the refunded amounts received by Public Service from its customers earned?

If earned, they were not refundable. If refundable, they were not earned. One cannot be deprived of that which he has earned.

Webster defines "earn" as: "To acquire by labor, service, or performance; to *deserve* and receive as compensation; as, to earn a good living." (Emphasis supplied.)

True, Public Service received the increases but, when received, Public Service, Denver, PUC and even the customers knew that the question of whether Public Service *deserved* the same was not then determined and would not and could not be ascertained until determination by FPC of the validity of the increased rates put into effect by Interstate. When Public Service received its refund from Interstate then it was ascertained that Public Service's increased collections *were not deserved, were not earned,* and *were refundable.*

The increases were ultimately refunded. Certainly one does not refund that which he deserves; that which he has earned.

Denver was thoroughly familiar with all of the proceedings from beginning to end. It was aware of the increases posted by Interstate; it knew those increases were unauthorized and subject to refund; it knew increases authorized by the PUC to Denver were interlocutory, contingent and refundable in the event Interstate refunded. Indeed, Denver appeared before the PUC on each occasion when increases were authorized. It appeared before the PUC on March 16, 1959, when Public

Service's plan for refunding to customers was considered, and on April 1, 1959, when PUC approved Public Service's plan for refunding subject to certain alterations imposed by PUC.

Here we have a contract between Denver and Public Service, a contract that "* * * is clear and expresses an intent which is not clouded by ambiguities." The parties have operated under the contract since 1947 with apparent complete understanding. In 1955 Denver and Public Service were confronted with a problem, under circumstances comparable, if not identical, to the situation now before us. During the period August 1952 through December 1953, Public Service had collected from its customers, for gas supplied, excessive charges. It had paid to Denver 3% of the excessive amounts collected. It was required to and did, in September 1955, make refund to its customers of the excessive collections. In its next quarterly franchise tax report made to Denver, Public Service deducted, from the amount due, 3% of the amount refunded to its customers ($48,694.52—the subject of Currigan's counterclaim) and Denver approved this deduction and, in so doing, it would seem, necessarily concluded that its contract did not contemplate its retaining as its own the 3% tax on monies received for excessive charges that were made conditionally, ordered refundable by PUC and refunded.

Again, on July 30, 1960, Denver recognized the fact that its contract does not sanction retention by it of 3% of refundable charges for gas, as evidenced by its adopting Ordinance No. 186, appropriating $249,795.26 "in full satisfaction and payment of * * * excessive franchise taxes paid during the period January 1, 1954, through February 1958 * * *."

The parties to the contract have from its inception been in complete accord as to its meaning, each intended the same thing. As of now we have nothing before us to indicate any misunderstanding as to the meaning of the contract and the intent of the parties.

Courts should not construe contracts in a manner contrary to the construction placed thereon by the parties.

In 17A C.J.S. 228-235, § 325 (1), it is stated:

"Where the parties to a contract have given it a practical construction by their conduct, as by acts in partial performance, such construction may be considered by the court in construing the contract, determining its meaning, and ascertaining the mutual intention of the parties at the time of contracting; it is entitled to great, if not controlling weight in determining the proper interpretation of the contract; and it will generally be adopted by the court. At least, it has been held that a practical construction by the parties will be adopted whenever it is possible, or legally possible, for the court to do so.

"The parties' practical construction of their contract has been characterized as a clue or index to, or as evidence of, their intention or meaning, and as an important, significant, convincing, persuasive, or influential factor in determining the proper costruction [sic] of the agreement. Since it is one of the best indications of the parties' true intention and meaning, it furnishes a safe, certain, or sound guide to, or a reliable means of arriving at, the correct interpretation of the contract. * * *."

In *Orman v. Potter*, 46 Colo. 54, 102 Pac. 893, this court said: "The parties themselves are in accord in construing this release as not covering the demands sued for in this action, and this court cannot put upon it a construction different from that put upon it by the parties themselves. * * *."

In *Hinkle v. Blinn*, 92 Colo. 302, 19 P. (2d) 1038, this court said: "We conclude that the conduct of the parties before the controversy arose, acting under the contract, is a reliable test of their interpretation of the instrument, and whatever the stress of subsequent disagreement, neither in his own interest may be heard to urge a different construction. *North Boulder Farmers' Ditch Co. v. Leggett Ditch and Reservoir Co.*, 63 Colo. 522, 168 Pac. 742; *New Brantner Ditch Co. v. Kramer*, 57 Colo. 218, 141

Pac. 498; *Lovell v. Goss,* 45 Colo. 304, 101 Pac. 72; *Cohen v. Clayton Co.,* 86 Colo. 270, 281 Pac. 111; *Illinois Building Co. v. Patterson,* 91 Colo. 391, 15 P. (2d) 699; *Thompson v. Sweet,* 91 Colo. 552, 17 P. (2d) 308; 6 R.C.L. 853. 'In construing a contract, the court will follow the construction placed upon it by the parties themselves.' *Buckhorn Co. v. Consolidated Co.,* 47 Colo. 516, 529, 108 Pac. 27. * * *."

In *Greeley Co. v. McCloughan,* 140 Colo. 173, 342 P. (2d) 1045, this court said: "Defendant urges that the language of the Agreement is indefinite and ambiguous requiring interpretation by the courts. Assuming this to be true, it is immaterial to the issues framed here because the parties themselves for at least forty-five years have by their conduct interpreted this document. Colorado has long recognized the rule that in construing a contract the courts will follow the construction placed upon it by the parties themselves. *Buckhorn Plaster Co. v. Consolidated Plaster Co.* (1910), 47 Colo. 516, 108 Pac. 27; *New Brantner Ditch Co. v. Kramer* (1914), 57 Colo. 218, 141 Pac. 498.

"And, the conduct of the parties acting under a contract before the controversy arose, is a reliable test of their interpretation of the instrument. *Hinkle v. Blinn* (1933), 93 Colo. 302, 19 P. (2d) 1038; *Western Motor Rebuilders Inc. v. Carlson* (1959), 138 Colo. 404, 335 P. (2d) 273."

In this case, we have the parties in 1955 recognizing that the contract sanctions deduction or return of the 3% tax paid on amounts later lawfully refunded to customers. We have the opinion of the city attorney issued to Currigan (not a party to the contract) at his request in which Denver's position is made clear that Public Service should, under the terms of the contract and the circumstances presented, receive the refund requested. In said opinion it is stated that:

"The rate increases by the suppliers were subject to adjustment by the Federal Power Commission. Ultimate-

ly the rates were set by the Federal Power Commission at a level lower than the rates charged during the period in question. The pipeline suppliers made a refund of all amounts they had collected in excess of the authorized rate.

"The Public Utilities Commission then ordered Public Service Company to refund the amounts received by it to its customers, the citizens of Denver, which has been done. *The effect of this refund was to reduce the gross revenue* of Public Service Company from its Denver customers.

"Under Section 13.1 'the company agrees to pay a sum equal to three percent (3%) *on the gross revenue* derived from the sale of gas by the company within the corporate limits of the City and County of Denver.'

"Section 13.2 defines 'gross revenue' as used in the franchise 'to mean *any revenue earned* within the City and County of Denver from the sale of * * * gas, *after adjustment for * * *, corrections of bills theretofore rendered.'*

\* \* \*

"The Public Utilities Commission, in its orders relating to the matter, permitted the Public Service Company, as a temporary expedient, to pass on the wholesaler's increases to the customers of Public Service Company, and provided in such orders that 'any moneys refunded to applicant resulting from the application of the rates for natural gas as finally determined by the Federal Power Commission, *shall be subject to refund to applicant's* (Public Service Company) *customers in a manner to be approved by this commission.'*

"The Public Service Company did not pass on to its customers the increased franchise tax, so, in effect, the amount for which refund is sought is 'out of pocket' expense. This has the effect of reducing the rate of return below that which the allowable rates were designed to yield to the company.

"Until the rate increases were settled, adjusted and

refunded there was no way to accurately calculate the tax to which Denver was entitled. The Public Service Company paid the tax on the basis of maximum revenues had Colorado Interstate Gas Company been able to sustain all of its applied for increases.

"Fairness and a reasonable interpretation of the contract dictate that the tax be figured on the basis of the true gross revenue received by Public Service Company of Colorado."

Here, the majority conclude that the contract means that which the parties to the contract say it does not mean, that the parties intended that which the parties say they never intended.

The majority disregard entirely that which the parties to the contract agreed upon, and make a new contract designed to let Denver retain $400,000.00, to which it neither has nor makes any legal or moral claim.

Denver has determined that refundable collections, later determined to be excessive and without authority of law and refunded, are not taxable; it should have been permitted, without litigation, to have complied with its contract.

Judgment should be entered in accordance with the prayer of Public Service's complaint, to the end that the contract may stand and not be abrogated, and that recognition may be given to that part of the contract which makes provision that where the parties, having determined that:

"* * * If the tax paid is found to be insufficient, the Manager of Revenue shall notify the Company of the deficiency and demand payments of said amount. *If the tax paid is determined to be excessive, the Company shall be entitled to a refund of the excess paid.*" (Emphasis supplied.)

MR. JUSTICE MCWILLIAMS concurs in this dissent.