No. 18,097.

WESTERN MOTOR REBUILDERS, INC. *v.*
SYLVIA I. CARLSON.
(335 P. [2d] 272)

Decided January 26, 1959. Rehearing denied February 24, 1959.

Mr. FRED J. PFERDESTELLER, Mr. FRED W. VONDY, for plaintiff in error.

Messrs. BARNARD & BARNARD, for defendant in error.

*En Banc.*

MR. JUSTICE SUTTON delivered the opinion of the Court.

THE parties appear here in reverse order of their appearance in the trial court, and we will refer to them as they there appeared or by name.

Plaintiff Sylvia I. Carlson brought an action seeking an injunction, damages and a decree for forfeiture of certain lands in Grand County, Colorado. She alleged breach of a restrictive covenant contained in a plat of the subdivision of the land involved and sold by the plaintiff to the defendant. In her complaint, filed June 23, 1954, plaintiff alleged that she was the owner of certain lands in Grand County, Colorado, known as Timberlane Subdivision; that on November 27, 1951, she filed a plat of such subdivision in the office of the County Clerk and Recorder of said Grand County; that the plat so recorded contained certain "protective covenants" as to the use of the lots as shown on said plat, and that among said "protective covenants" are the following:

"2. There shall be sewage disposal by septic tank in connection with any building, which septic tank or tanks shall be placed 20 feet or more back of property line."

"4. No business can be established on any lot without the written consent of the Subdivider, her heirs or assigns."

"6. Violation of any of these covenants by parties of the second part, their heirs, successors or assigns, shall make this deed null and void, and all right, title and interest in and to the property herein conveyed shall revert to the party of the 1st part, her heirs, successors or assigns."

It is then alleged that by deed dated November 14, 1951 (actually dated November 6, 1951), plaintiff conveyed lots 2 and 5 in block 1 of said Timberlane Subdivision to the defendant corporation, which conveyance was filed for record in the office of the Clerk and Recorder of Grand County on December 20, 1951; that said con-

veyance contained a description of the lots conveyed and then recited "subject to the protective covenants as shown on the official plat thereof on file in the office of the County Clerk and Recorder of Grand County, Colorado." She then further alleged that defendant has breached the protective covenants therein referred to in that it has established and is prosecuting the business of operating a motel on the property conveyed, and disposing of sewage by means other than accepted septic tank methods. She prayed for a temporary and permanent injunction prohibiting defendant and its agents from further prosecuting any business on the described property; from disposal of sewage by other than approved septic tank methods; and, for a decree adjudging the property to have reverted to her as a consequence of such breaches and for damages.

Defendant by answer presented several defenses, among which were: 1. That defendant purchased the property involved prior to the establishment of the alleged protective covenants. 2. Laches. 3. Estoppel. 4. Waiver. It also counterclaimed asking for a decree quieting title in defendant.

Trial was had to the court following which findings in favor of plaintiff were made and a decree entered permanently enjoining defendant from establishing, operating or maintaining any business enterprise upon the land involved. Damages and a reversion of the property were refused. Motion for a new trial was dispensed with and the defendant is here by writ of error seeking reversal.

The facts, as disclosed by the record, are substantially as follows: The plaintiff Sylvia I. Carlson was, in the spring of 1951, the record owner of a tract of land comprising some ten acres on Highway 34 in Grand County, and three or four miles from Grand Lake. She planned to subdivide this land into lots of one acre each, and to that end had arranged with the county surveyor to survey the land involved and prepare a plat thereof. The

defendant is a Colorado corporation, the stock of which is held by Robert W. Porter, his wife and an employee. All of the proceedings here were conducted by Mr. Porter on behalf of the corporation, and since all of the parties involved in the controversy regarded Mr. Porter as the corporation and the corporation as Mr. Porter, and throughout the record refer to the defendant as "he" rather than "it," it may be less confusing if we treat the defendant as real, in the person of Mr. Porter, in preference to its artificial character as a corporation.

Sometime prior to May 1951, Porter became acquainted with O. H. Carlson, husband of Sylvia, and learning that the Carlsons had land for sale in a location suitable for summer recreation, fishing and the like, expressed a desire to visit the Carlsons and inspect the land. This he did on several successive weekends. During May and early June of 1951, Porter was a frequent visitor at the Carlson establishment and his proposal to purchase one of the acre tracts was the subject of extended discussions. The consummation of a deal was delayed, however, because the survey was not completed and the boundaries of the lots fixed. Also there was an encumbrance on the property which would have to be released before clear title could be conveyed. In the meantime on weekends Porter visited the tract he had selected often in company with Mr. Carlson, and plans were laid and locations selected for a well and other improvements. In all this Carlson acted as friend and adviser. In fact, the parties became very friendly, visiting each other on occasion both in Denver, where Porter lived, and at the Carlsons' Lodge in Grand County. During the period of this friendly intercourse some discussion was had of the character and type of buildings which should be erected upon the lots to be platted and sold. It was Porter's understanding, according to his testimony, that such conversations as were had related to the proposition that "tar paper shacks" would not be permitted to deface the landscape; that no restrictive conditions of a specific

nature were ever discussed or brought to his attention. It is undisputed that the restrictive covenants or conditions as they appear on the recorded plat were not formulated or reduced to writing until shortly before the plat was recorded. Porter denies that they were ever shown to him or called to his attention, and the plaintiff's testimony in this respect is vague and uncertain. On June 30, 1951, the negotiations that had been carried on for several weeks were consummated. On or prior to that day the surveyor had set the stakes marking the boundaries of the lot that Porter desired to purchase. This appears as lot 2 on the recorded plat, although it was not so designated at the time, since the plat was not completed. Having selected the plot desired, Porter, together with Mr. Carlson, repaired to the Carlson Lodge where Mrs. Carlson was in attendance. Porter wrote his check for the sum of $750.00, being the full purchase price of the lot as previously agreed upon. This check was accepted by Mrs. Carlson and Porter was put in possession of the tract as staked. Improvement of the property was immediately begun and Mr. Carlson was employed by Porter to do some of the work. During the summer of 1951 a cabin was constructed on a corner of the lot, the location of a well finally determined and the land cleared for further construction. Other work, such as completing the well, preparing foundations and clearing the land, was carried on during the summers of 1951 and 1952. In the meantime, on or about Labor Day 1951, Porter negotiated for and purchased an adjoining fractional lot, which he also paid for in full and of which he took possession.

On November 14, 1951, while in Denver, Mrs. Carlson acknowledged a warranty deed from herself to the defendant corporation, before a notary public whose commission had expired. This deed was dated November 6, 1951. Notwithstanding she was in Denver at the time the deed was acknowledged, she made no effort to deliver it to Porter, her reason being "because I wasn't

ready to deliver the deed to him." On November 27, 1951, the plat of Timberlane was filed in the office of the Clerk and Recorder of Grand County. It appears to have been acknowledged on October 27, 1951, before the County Clerk and Recorder and if correct indicates that Mrs. Carlson made two trips to the county seat exactly a month apart — one to acknowledge the plat, the other to record it. Her testimony on this point was uncertain. An examination of the plat appearing in the record would appear to support the theory that it was acknowledged on the same day it was filed. During all this time she had the deed to defendant in her possession. She did not mail it to Porter, nor did she advise him that it was ready for delivery. On the contrary she kept it nearly a month thereafter and then without his knowledge or consent recorded it herself and directed the County Clerk to mail it to Porter in care of the corporation.

Porter testified that when he received the deed he did not examine it, but put it away in the company safe where it remained until the present controversy arose.

In early 1953 work was started on the first six units of the motel. These were completed about July 1st and an additional eight units completed in the early fall of that year by which time more than $45,000.00 had been expended in the construction of the motel and other improvements. While this was going on Porter was a frequent visitor at the Carlsons, often going there to use the telephone, visiting and discussing his plans and activities. Mrs. Carlson was asked if in the spring of 1953 she knew that Porter was building a motel, and she replied: "Mr. Porter very definitely said what he was doing. He didn't ask, but he said on several occasions that it was a rental unit." Asked if she made any objection at that time, she answered, "I said nothing — I listened," and again, "I didn't say, 'You can't do it.' He didn't ask me if he could do that or have written consent." It is not disputed that on more than one occasion during the summer of 1953 the Carlsons brought or sent

parties to the defendant's motel for accommodations; even loaned him (either personally or through their employees) an "Open Come In" sign, and in other ways manifested an interest in his activities.

Mr. Carlson testified that sometime prior to October 20, 1953, he verbally called Porter's attention to the fact that the covenants as appear on the recorded plat were being violated, and asserts that on October 20, 1953, he wrote him a letter, a carbon copy of which appears in the record as Plaintiff's Exhibit D, calling attention to the alleged violation of the covenants. Porter denies receiving the letter, or that any such conversation as testified to by Carlson ever occurred. Carlson's testimony, taken by deposition shortly after the action was filed and two years before the trial, discloses that he was unable to recall dates or details of conversations. What he said to Porter or what Porter said to him is obscured by such statements as "I don't remember," and "I — I just don't recall those words exactly," or "There was some discussion about it, yes." Mrs. Carlson's testimony is equally unsatisfactory as to detail of conversations said to have been had with Porter, although at the time of the trial, two years after the taking of her deposition, her memory was much better. She explained this by saying, "I have given the entire thing a lot of thought and a lot of things come back to you when you really give them some study," and again, "When I went into the deposition you asked these questions and I don't have time to think about them. When you go back and try to think the thing out day by day I think it becomes clearer to you." She testified that she had had an opportunity to re-read the questions and answers of her deposition, and had given the matter more thought and concentration than at the time of giving the answers when the deposition was taken. At the trial she testified definitely to facts concerning which she was vague and uncertain at the taking of her deposition two years before.

The defendant's assigned points of error can be sum-

marized as: 1. That defendant took the property free of the alleged covenants. 2. The recorded plat is invalid. 3. Plaintiff may not enforce the alleged covenants by reason of estoppel, laches and waiver. 4. The judgment and decree are contrary to the law and the evidence.

The plaintiff complains that the trial court did not decree a reversion, and urges that the judgment be reversed as to that phase.

We pause to compliment counsel on both sides on the clarity and vigor of their briefs, which serve not only as a tribute to the learning and industry of counsel but have been of great assistance to the court.

A careful examination and study of the record has persuaded us that a determination of defendant's first point of error will dispose of the controversy. Stated in different words than above, the question presented is:

Did the defendant, under the facts herein presented, upon full payment of the consideration and taking possession of the land involved, take such land subject to restrictive covenants formulated and recorded five months thereafter?

This question must be answered in the negative. The trial court in its findings stated:

"In the opinion of the Court, until that deed was delivered there was no completed transaction. There was no purchase and sale because the execution and delivery in this case, as well as in all real estate conveyances of which I have any knowledge, is an essential ingredient, and until and unless that deed is delivered, the contract is executory, it isn't an executed or completed contract."

This is the erroneous premise upon which the findings and decree of the trial court were based.

From the facts as recited above it is clear that when the defendant paid the purchase price in full and was put in possession of the land, any conditions or restrictions, which the plaintiff may have had in mind as to the future development of the tract of land she intended to plat, were in a nebulous state, neither for-

malized nor reduced to writing until months after she had divested herself of all equitable right, title, interest or control of the tract here involved. True, she had not yet executed and delivered a deed to the grantee, but her interest was that only of a holder of the naked legal title in trust for the purchaser.

55 Am. Jur. 785, Sec. 357, states:

"When the payments are fully made, the entire equitable title is in the vendee and the vendor retains the naked legal title in trust for him."

In *Fagan v. Bach* (1912), 253 Ill. 588, 97 N.E. 1087, a case involving the payment of the consideration for the purchase of real estate, the court said:

"If the appellants had been able to establish, by competent and satisfactory proof that Peter Bach had paid the entire purchase money agreed to be paid to Patrick S. Fagan by him for said premises, there can be no question but * * * the payment of said purchase money would have invested Peter Bach with the full equitable title to said premises, and the only interest which Patrick S. Fagan would have in said premises would have been the bare legal title, which he would have been required to convey to Peter Bach by a court of equity * * *."

In *Goodman v. Smith* (1955), 177 Kan. 712, 281 P. (2d) 1094, purchasers of land had been put in possession and had paid the purchase price in full, but a deed had not yet been delivered. As against a levy of execution by creditors of the vendor, the court said:

"Appellant next contends that the grantor still had legal title, but it is generally held and is followed in Kansas that a judgment and execution against the owner of the bare legal title is not a valid lien on the realty where the equitable title has been previously vested in another."

As against a claim that the contract of the parties remained executory until delivery of a deed, the court then observed:

"Appellant refers to the contract as an executory con-

414

tract, but in view of the stipulated facts and what has been said, the contract * * * had, by January 31, 1953, become no contract because its terms had been fully complied with and carried out. This left nothing to which the later judgment and execution * * * could attach so far as the real estate in question was concerned."

And in *Larson v. Metcalf* (1926), 201 Ia. 1208, 207 N.W. 382, 45 A.L.R. 344, it was said:

"As the vendee makes his payments, the vendor becomes trustee for him of the legal estate, and the vendee becomes in equity the owner of the estate to the amount of his payments. When the payments are fully made, the full equitable title vests in the vendee, and the vendor retains the naked legal title in trust for him."

In Colorado the same rule has been applied. *Connecticut Fire Ins. Co. v. Colorado Leasing, etc., Co.* (1911), 50 Colo. 424, 116 Pac. 154, was a case involving the right of the equitable owner of insured property to recover under the terms of a policy issued to the beneficiary upon the condition that it would be void if the interest of the insured be other than unconditional and sole ownership. At the time the policy was issued the plaintiff was the holder of a contract of purchase and was in possession. The court there said beginning at page 438:

"True, it did not have the legal title, its title was an equitable one, but it was an equitable title that contemplated and embraced full ownership. The estate owned may be in fee simple, though the title by which it is held be an equitable one. The plaintiff was the owner in fee simple by an equitable title. The vendor held the legal title in trust for the plaintiff. The plaintiff being in possession, the vendor could not convey this legal title to another, free from the trust impressed upon it."

In *Universal Insurance Company v. Arrigo* (1935), 96 Colo. 531, 44 P. (2d) 1020, a case also involving the question of sole and unconditional ownership, the court said:

"The husband was the holder of a contract to purchase and was in possession. He had an equitable title which

contemplated full ownership, and this was an estate in fee simple, while the title was an equitable one. This met the 'unconditional and sole ownership' clause of the policy and was within its meaning."

 Here the parties went upon the land to be conveyed; the stakes marking the boundaries were pointed out to the purchaser; he forthwith paid the full purchase price and was put in possession and immediately started improving the property. Although the parties were in all probability not conscious of it, they here performed all of the elements of the ancient ceremony of Livery of Seisin, with the possible exception of that of the vendor handing a clod of earth to the purchaser, although subsequent events testify that a considerable quantity of mud was thereafter flung about by the parties. While livery of seisin is no longer necessary to effect a conveyance of land in Colorado, according to our statute (C.R.S. '53, 118-1-3), it can be effective as a means of putting a vendee in possession and giving notice to the world that he is the lawful owner.

 It is claimed that because Porter had the deed in his possession at the time he constructed the motel, he is bound by its terms and is charged with notice of the conditions and restrictions referred to therein. We think this claim is not valid for two reasons. First, the deed was not delivered to him by the plaintiff prior to its recording, but was withheld by plaintiff for more than a month after its date, although the parties were together frequently during that time and the opportunity to deliver it to Porter was present on several such occasions. Much is made of the fact that Porter did not examine the deed, and that because he had it in his possession and did not do so, he is bound by its conditions. We think that under the circumstances appearing in this record Porter had the right to assume that the deed, when received by him in the mail, did no more than confirm his title in fee simple to the property he had bought and paid for. Second, had he examined the deed and

pursued a strict legal course by repairing forthwith to the county seat to examine the records, he would have discovered that the phrase appearing on the deed, "Subject to the protective covenants as shown on official plat thereof on file in the office of the County Clerk and Recorder, Grand County, Colorado," meant nothing since no such plat was on file in that office on the day the deed was executed, November 6, 1951. No such plat appeared of record until November 27, 1951. He would not have been obliged to look further. The fact that the deed was recorded by plaintiff on the following December 20th, is of no significance. The deed referred to the condition of the records as they existed on November 6th, and that is all this grantee could be bound by. A subsequent recording of the deed by the grantor, delayed until after the plat had been filed, could neither retard the effective date of the deed nor accelerate the effective date of the filing of the plat. The doctrine of merger, urged by plaintiff, cannot apply to these facts.

When the plaintiff accepted payment in full for the property involved and delivered possession thereof to the defendant, she fully and completely divested herself of all equitable right, title, interest or control of the property and was without right or authority to afterward impose conditions or restrictions upon the defendant's right to possession and enjoyment of the grant without his consent. By the acts of these parties the transaction was fully executed and their rights fixed. Nothing but conveyance of the naked legal title remained to be done. In holding otherwise we think the trial proceeded upon a false and erroneous premise. This record does not justify the apparent belief of the trial court that the parties had intended that the delivery of the deed would be held up until plaintiff had recorded a plat with these conditions therein. The actions of the parties themselves belie such a possibility. The intention of the parties and their interpretation of their contract before controversy arises is one of the best indications of their

true intent. See: *Manhattan Life Insurance Co. of N. Y. v. Wright* (1903), 126 Fed. 82, 87; *Lovell v. Goss* (1909), 45 Colo. 304, 101 Pac. 72; *Baird v. Baird* (1910), 48 Colo. 506, 111 Pac. 79; *Cohen v. Clayton Coal Co.* (1929), 86 Colo. 270, 281 Pac. 111. Holding up the deed until the description could be surveyed did not justify the addition of conditions to the title.

Although we ground our conclusion upon the reasons above stated, we think the defendant's claims of estoppel and laches are also valid.

█ As has been shown, the defendant, upon entering into possession of the property, proceeded immediately to improve it. He discussed his plans with the plaintiff and her husband and throughout the spring and summer of 1953 was constantly engaged in constructing the motel buildings. He made no effort to conceal his plans but was in frequent contact with the plaintiff and her husband, the latter having been employed in some of the work and loaned some of his equipment to the defendant. Throughout the spring and summer of 1953 they stood by and watched him expend in excess of $45,000.00 in this construction, loaned him a sign, or had it loaned to him, and sent parties to him for accommodation. The plaintiff's husband expressed the wish that they, his wife and himself, could also build a motel. Although there is some confusion in the testimony on the point, it appears the plaintiff and her husband even participated in selecting a name for the motel. It was not until after all of the construction work had been done and the motel in operation that the plaintiff made a specific objection. All during the summer she sat by and "said nothing. I listened." It was not until October of that year that, as she claims but Porter denies, she notified him in writing of the alleged violation of the covenants. One may not sit by, or lie in wait, so to speak, while the other party expends money in good faith in improving property he has purchased, and when the expenditures are made and the value of the property greatly enhanced, claim that in

418

doing so the purchaser had violated conditions which work a forfeiture of the estate.

The trial court, based on this record, came to the erroneous conclusion that the plaintiff believed Porter was merely constructing a place for his employees. Although the general rule is that the appellate court should search the record for facts to sustain the trial court's findings (*Gonzales v. Chinn* [1949], 121 Colo. 126, 214 P. [2d] 371), the further rule also set forth in the *Gonzales* case applies here; viz., that the province of the trial court will not be disturbed on review unless the conclusion reached is so manifestly against the weight of the evidence as to show that the trial court misconceived its force and effect. That is the situation here.

Clearly plaintiff is estopped to assert any breach of the conditions under the facts disclosed even if the conditions had been validly imposed.

In *Stewart v. Finkelstone* (1910), 206 Mass. 28, 92 N.E. 37, the court said *inter alia:*

"If there has been unreasonable delay in asserting claims or if knowing his rights, a party does not seasonably avail himself of means at hand for their enforcement, but suffers his adversary to incur expense or enter into obligations or otherwise change his position, or in any way by inaction lulls suspicion of his demands to the harm of the other, or if there has been actual or passive acquiescence in the performance of the act complained of, then equity will ordinarily refuse her aid for the establishment of an admitted right, especially if an injunction is asked."

The foregoing quotation, though applying laches, can also serve to emphasize an estoppel here and might serve as a catalogue of the acts and conduct of the plaintiff and her husband throughout the spring and summer of 1953.

The essential element of laches is an unconscionable delay in enforcing a right under circumstances usually involving a prejudice to the one against whom

the claim is asserted. *Loveland Camp No. 83 v. Woodmen* (1941), 108 Colo. 297, 116 P. (2d) 195.

Here a material detriment arose as to Porter because plaintiff not only sat by but apparently aided in the building of the motel. It was a situation which required the prompt assertion of plaintiff's rights (assuming the deed restrictions had been binding). No required period of time need elapse before laches may become a valid defense. Even a few months or weeks will suffice if the facts and circumstances so warrant. See: *Graff v. The Portland Town and Mineral Co.* (1898), 12 Colo. App. 106, 113, 54 Pac. 854; *Great Western Mining Co. v. Woodmas of Alston Min. Co.* (1890), 14 Colo. 90, 23 Pac. 908; *Divide Canal & Reservoir Co. v. Tenny* (1914), 57 Colo. 14, 19, 139 Pac. 1110.

In the *Divide Canal* case the court said:

" * * * 'He who is silent appears to consent.'

"It is settled law that if a party by conduct has intimated that he consents to an act which has been done, or will offer no opposition to it, although it could not have been lawfully done without his consent, and he thereby induces others to do that from which they otherwise might have abstained, he can not question the legality of the act he has so sanctioned to the prejudice of those who have acted on the fair inference to be drawn from his conduct."

In view of our conclusion, other matters urged in the briefs need not be discussed.

The judgment is reversed and the cause remanded with directions to dismiss the action.

MR. JUSTICE DAY not participating.