578 P.2d 232 (1978)
Loren E. SMITH, Plaintiff and Third-Party Defendant-Appellee,
v.
Clyde H. LONG, Defendant and Third Party Plaintiff-Appellant.
Nos. 77-239, 77-1090 and 78-019.
Colorado Court of Appeals, Division II.
April 6, 1978.
*233 Thomas R. Young, Thomas J. Zavislan, Lakewood, for plaintiff and third party defendant-appellee Loren E. Smith.
Nelson, Hoskin, Groves & Prinster, P. C., Gregory K. Hoskin, Jon E. Getz, Grand Junction, for defendant and third-party plaintiff-appellant Clyde H. Long.
VanCISE, Judge.
On January 17, 1958, American Sovereign Mines leased certain unpatented uranium lode mining claims to Gaddis Mining Company, receiving as consideration $5,000 at the inception of the lease plus prospective royalties from production. The primary term of the lease was 20 years, to continue for as long thereafter as mining operations were being conducted on the premises. By 1962, Gaddis had expended a net amount of $107,187 for development of 3 acres of the 125-acre property. Subsequently, Clyde H. Long, the appellant, and Loren E. Smith, the appellee, acquired the interests of lessor and lessee, respectively. Following receipt of a notice of default in March 1974 and the recording by Long and American of a notice of cancellation in July 1974, Smith brought a declaratory judgment action against Long and American to establish the validity of his leasehold interest. The trial court *234 found the lease to be in good standing, declared the notice of cancellation null and void, and permanently enjoined Long from interfering with the leasehold estate. Long appeals. We affirm the judgment of the trial court.
The pertinent sections of the lease are: IIGADDIS covenants and agrees to commence operations upon said demised premises on or before June 1, 1958 and covenants and agrees to cause to be performed upon said premises no less than $8,000 of work each year, provided, however, that after 1962, and in the event there exists no market for developed ore, then this work requirement shall be waived. It is agreed that the work to be performed in the amount stated shall be inclusive of all work of every type and character conducted on the leased premises whether of labor, core or drilling, underground exploration and any other work, but excluding therefrom all sums paid to persons in a supervisory capacity.
. . . . .
XXGADDIS shall be excused from the performance of the provisions of this lease by reason of, but not limited to, labor strikes, fire, floods, explosions, riots, acts of God, unusual mining casualties, lack of market and lack of milling or smelter facilities, severe weather conditions or any other cause, whether similar or dissimilar to the causes mentioned and beyond the control of GADDIS. Performance of the provisions of this agreement shall be excused hereunder only as long as any of the Force Majeure causes continue to exist. (emphasis added)
The focal point of this appeal concerns the work requirement of $8,000 per year. In 1962, the market prices for uranium dipped because of the cessation of an Atomic Energy Commission purchase program. Therefore, no work other than assessment was performed on the property from 1962 until 1976. With respect to other litigation, American informed Smith by letter dated March 1, 1967, that the contract remained in full force and effect at that point; therefore, it is only necessary to address the issue of default subsequent to that date.
Long contends that the parties to the contract, cognizant of the unpredictability of the post-1962 uranium market, intended to excuse the annual $8,000 work requirement only if there was no market at all. He argues that if there was any market, albeit unprofitable to the lessee, the work was to be performed. From this he asserts that, since the work requirement had not been satisfied, Smith was in default and cancellation of the contract could be effected.
We agree, however, with the interpretation of the provisions given by the trial court excusing the work requirement if commercial mining would not be profitable for the lessee. While written documents containing unclear terms are to be construed with regard to the intentions of the parties, Leach v. La Guardia, 163 Colo. 225, 429 P.2d 623 (1967), one of the best methods of determining the true intent of the parties is their behavior and interpretation of the contract before controversy arises. Western Motor Rebuilders, Inc. v. Carlson, 138 Colo. 404, 335 P.2d 272 (1959). Here, according to the 1967 letter from American to Smith, the contract continued to be in effect, notwithstanding the failure of performance since 1962. Thus, while perhaps not operating as a waiver of the work condition subsequent to that date, the letter does indicate that the parties intended the application of a profit standard to the term "market."
The lessee, as well as the lessor, is entitled to a profit, Colorado Fuel & Iron Co. v. Pryor, 25 Colo. 540, 57 P. 51 (1898); Brewster v. Lanyon Zinc Co., 140 F. 801 (8th Cir. 1905). Such an interpretation is fair and reasonable, and is preferred to one that effects a harsh or unreasonable result. Hutchinson v. Elder, 140 Colo. 379, 344 P.2d 1090 (1950). Under this type of covenant, the lessee does not have an obligation to engage in an unprofitable endeavor. Colorado Fuel & Iron Co. v. Pryor, supra. Since the contract provisions excuse all work if there is no market, Smith is not in default, *235 and the trial court correctly determined the contract to be in good standing.
Long also urges that Smith failed to meet his burden of proof that there was no market for each year after 1967. Upon review of the record, we find sufficient evidence to support the conclusion by the trial court that until 1974 commercial mining operations would not have resulted in a profit. Because of the remote location and the steep terrain, access to the property was difficult, and it could be reached only by use of narrow gage railroad tracks or on foot. Bringing equipment into the area involved considerable expense. Removal of the ore by rail was limited to a four-month period during the summer months when the tracks were open and, even then, scheduling around the passenger service was necessary. Freight cars were also virtually unavailable. Nearby uranium mills were closed, resulting in additional transportation expenses to transport the ore long distances. The total cost for mining, transporting and milling ranged between $65 and $70 per ton to realize a market price of $33-$40 per ton.
From 1974 to 1976, the market prices rose, but any work performance was excused by the giving of the notice of cancellation, which put in issue the rights of the lessee. See Brooks v. Arkansas-Louisiana Pipe Line Co., 77 F.2d 965 (8th Cir. 1935); Transcontinental Oil Co. v. Thomas, 29 F.2d 733 (5th Cir. 1928).
Long also asserts that there was an implied covenant in paragraph II of the lease requiring the lessee to explore all claims, and that only after exploration can a determination of non-profitability be made. He claims that the characterization of ore as "developed" implicitly requires prior exploration. In addition, he argues that since the initial rental payment of $5,000 is modest, the court should imply a covenant to explore, similar to Dulin v. West, 35 Colo. App. 6, 528 P.2d 411 (1974), wherein this court implied a covenant to develop. We do not agree.
Although the court must ascertain the intent of the parties from the terms of the contract, caution must be exercised when an implication of a condition or term would result in a breach. Bator v. Mines Development, Inc., 32 Colo.App. 320, 513 P.2d 220 (1973). In Dulin, the annual rental payment was a minimal $10. In the present case the prepaid $5,000 rental is substantial, and is sufficient to preclude any implication of a covenant of exploration. Under the facts of this case, there is no implied duty to explore. Further, assuming arguendo there was an implied covenant to explore, paragraphs II and XX read together excuse any work, including underground exploration, if there is no market.
The trial court granted Smith's motion to toll the running of the 20-year primary term of the lease from the time of the filing of the notice of appeal (March 7, 1977) until final determination by the appellate court and, by amended order, relieved the lessee of all obligations under said lease during that time. This court, without prejudice to the above order, entered a comparable order to maintain the status quo and prevent a termination of the lease because of the expiration of the primary term during the pendency of this appeal. We reaffirm that order. See Chapman v. Bowers, 180 Okl. 49, 67 P.2d 788 (1937). However, regardless of market conditions, the term of the lease is January 17, 1958, to January 17, 1978, plus the extension for the time tolled, and for as long thereafter as mining operations are conducted thereon, unless sooner relinquished, surrendered, or abandoned by the lessee.
Judgment affirmed.
ENOCH and BERMAN, JJ., concur.