Clare **GREGG**, Plaintiff,

v.

**AMERICAN QUASAR PETROLEUM COMPANY, et al.,** Defendants.

Civ. A. No. 88 N 9.

United States District Court,
D. Colorado.

March 6, 1991.

On Motion for Reconsideration
April 29, 1993.

Ralph Rhodes, Denver, CO, for plaintiff.

John Pfeiffer, Denver, CO, Cecil E. Munn, Cantey & Hanger, Fort Worth, TX, for defendants.

## ORDER

NOTTINGHAM, District Judge.

Plaintiff is a former employee of American Quasar Petroleum Company of New Mexico. He claims that defendants, American Quasar Petroleum Company of New Mexico and others, did not pay the correct amount due him under defendants' oil finding bonus plan. Plaintiff claims that a greater quantity of proved oil and gas reserves should have been included in the figures used to determine his bonus payments and that, as a result of these incomplete determinations, plaintiff received inadequate bonuses.

The matter is now before me on defendants' motion for summary judgment. Jurisdiction over the subject matter is premised on the parties' diverse citizenship. 28 U.S.C. § 1332(a) (1982). The issues presented by this motion turn primarily upon the proper legal interpretation of the oil finding bonus plan which defendant initiated. The bonus plan is before the court as an exhibit to defendants' motion, and plaintiff does not question its authenticity. Plaintiff advances four arguments in support of its position that defendants are not entitled to summary judgment. I reject each argument, and grant defendants' motion for summary judgment.

## I. FACTS

Plaintiff began employment with defendants in approximately December 1973. He was terminated on January 15, 1985. In 1977, defendants introduced the bonus plan. The apparent purpose of the bonus plan was to retain key employees and to reward excellent work. The explanation to the bonus plan stated:

> The oil finding bonus was established beginning with the 1977 exploration year to provide a cash bonus reward for finding oil and gas. The original bonus was established at $50,000 per each 1,000,000 barrels of oil, or natural gas equivalent net to American Quasar's interests.
>
> Due to oil price increases, the 1980 bonus will be based on $150,000 per each 1,000,000 barrels of oil or natural gas equivalent. This bonus will be allocated on the basis of $100,000 (or ⅔) to the staff in the finding division and $50,000 (⅓) to the other divisions and key operations and administrative personnel. The allocation among the division staff will be based on the division manager's recommendation and approval by the Executive Committee. The bonus will be adjusted for future years to reflect changes in oil prices.

*Plaintiff's Brief Opposing Defendants' Summary Judgment Motion,* Appendix C, Exhibit 147. During his employment with defendant, plaintiff received a bonus for the years 1977 through 1983. After plaintiff was discharged, he reviewed documents regarding five natural gas fields discovered during the bonus years. Plaintiff concluded that the Denver division had not received the dollar bonus it should have, based upon the formula set out in the bonus plan, as the proved resources used to calculate the bonus were inadequate. Consequently, he argues his individual bonuses were inadequate.

On June 20, 1989, Judge Weinshienk held that the bonus plan constituted a contract between plaintiff and defendant. The issue now is whether the terms of the contract have been met. Summary judgment is proper if the pleadings, depositions, answers to interrogatories, admissions, or affidavits show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). Summary judgment is appropriate against the party who fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex Corporation v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The nonmovant must offer evidence to dispute the facts demonstrated by the evidence of the movant. *Id.,* 477 U.S. at 324, 106 S.Ct. at 2553. The party bearing the burden of proof cannot rely on conclusory allegations in an affidavit. *Lujan v. National Wildlife Federation,* 497 U.S. 871, 898, 110 S.Ct. 3177, 3194, 111 L.Ed.2d 695 (1990).

## II. ANALYSIS

### A

Plaintiff's first argument is that, in calculating the proper bonus, the reports of Cawley, Gillespie & Associates, Inc., ("Cawley"), the petroleum engineering firm retained by defendants, are not conclusive determinations of the amount of proved reserves of oil and natural gas discovered. Plaintiff points out that nothing in the agreement mentions Cawley. Plaintiff does not question the calculation of bonuses already paid based on Cawley's determinations of proved reserves of oil; rather, plaintiff questions Cawley's role in determining the proved reserves and the number of locations which Cawley "was told, or chose, not to consider." *Plaintiff's Brief Opposing Defendants' Motion for Summary Judgment,* p. 11.

The bonus contract does not state who would determine the reserves which formed the basis for the bonus determinations. Defendants cite *Empson Packing Co. v. Clawson,* 43 Colo. 188, 95 P. 546, 547 (1908) for the proposition that, where the contracting parties choose a third party to determine certain facts, the parties are conclusively bound by that third-party determination. *Empson,* however, is not dispositive of this case. In *Empson,* the parties expressly designated a party to make certain determinations; the parties made no such designation in this case.

When a contract does not clearly state the parties' intent, the intent and purpose of the parties can be determined from the parties' conduct, their oral statements and their writings, and other evidence illuminating the circumstances surrounding the contract's making. *I.M.A., Inc. v. Rocky Mountain Airways, Inc.,* 713 P.2d 882, 888 (Colo.1986). Furthermore, the intention of the parties and their interpretation of their contract before a controversy arises is one of the best indications of their true intent. *Western Motor Rebuilders, Inc. v. Carlson,* 138 Colo. 404, 335 P.2d 272, 279 (1959). Thus, the parties' construction of the contract before the dispute arises is a particularly persuasive aid in determining the agreement's true meaning. *Concerning Application for Water Rights etc. v. Northern Colorado Water Conservancy District,* 677 P.2d 320, 327 (Colo.1984). As I find the contract unclear regarding who would determine the reserves which were the basis for the bonus, I look to the parties' conduct before this dispute arose to clarify the parties' intent regarding who would determine the proved reserves.

Plaintiff received bonuses in the years 1978 through 1984 for each of the preceding years. These bonuses were part of the bonuses paid to the Denver Division of American Quasar. *Defendants' Appendix to Motion for Summary Judgment,* exhibit 14. These determinations were based on reserve calculations made by Cawley, and Cawley was the engineering firm which was designated to make the reserve calculations. *Defendants' Brief Supporting Motion for Summary Judgment* at 7. In his deposition, Gregg admitted that he knew that the reserves on which the bonuses were based would be calculated by independent engineering audits, and that Cawley was the firm chosen to determine these reserves. *Defendants' Appendix to Motion for Summary Judgment,* exhibit 5, pp. 18–19. Similarly, Dick Lowe, American Quasar Petroleum Company's CEO during the period at issue in this case, testified that reserves were calculated by Cawley and that these determinations were always used as the basis for the oil and gas finding bonus. *Id.* at exhibit 7, pp. 40–41. Thus, the parties' conduct prior to the dispute clearly indicates that Cawley was chosen to determine the proved reserves and that the management and personnel were aware of Cawley's role. Prior to this dispute, Cawley's determinations were never questioned.

As the bonus plan does not designate who was intended to calculate the reserves, this court must resolve this issue by examining the parties' consistent practice prior to the dispute. *Smith v. Long,* 40 Colo.App. 531, 578 P.2d 232, 234 (1978). Plaintiff knew and understood that Cawley's calculation of reserves was the basis for bonuses, and he accepted (without reservation or protest) bonuses based on this calculation. Having done so, he may not now seize on the contract's omission of an express term designating Cawley as a justification for his attempt to introduce an alternate, more lucrative way of calculating bonuses.

**B**

Plaintiff's second argument against the granting of defendants' motion for summary judgment is that the reserves, which were the basis for the oil finding bonus determinations, failed to include other components of the gas stream—carbon dioxide, hydrogen sulfide and helium (the "components")—which should have been included in these reserves. The reserves that were the basis for the bonus determinations were only proved reserves, and the parties are arguing what reserves were proved. *Plaintiff's Brief Opposing Defendants' Summary Judgment Motion,* Appendix C, exhibit 92, p. 92(2). Plaintiff argues that these components should have been included in the proved reserves, because defendants gave them economic value in their corporate documents, reports, and confidential sales offerings. I reject this argument on two grounds.

First, implicit in plaintiff's acceptance of Cawley as the engineering firm which would determine the reserves that were the basis for the bonuses in the years 1978 through 1983 is plaintiff's acceptance of Cawley's determination of these reserves. If Cawley was chosen to make these determinations, then an implied part of the arrangement is

that Cawley would use its expertise and experience in the determinations of the reserves which formed the basis for the bonuses. Plaintiff knew that Cawley used proved reserves as the basis for the bonuses, and he cannot now question this practice to support his argument for a larger bonus.

Second, I find that the language of 17 C.F.R. § 210.3–18(a)(2) (1979) (now at 17 C.F.R. § 210.4–10[a][2] [1990]), setting forth financial accounting and reporting for oil and gas producing activities pursuant to the federal securities laws and the Energy Policy and Conservation Act of 1975 and defining proved reserves (which Cawley used to determine the proved reserves) also requires rejection of plaintiff's contention. Section 210.3–18(a)(2) states:

> Proved oil and gas reserves are the estimated quantities of crude oil, natural gas, and natural gas liquids which geological and engineering data demonstrate with reasonable certainty to be recoverable in future years from known reservoirs under existing economic and operating conditions, i.e., prices and costs as of the date the estimate is made. Prices include consideration of changes in existing prices provided only by contractual arrangements, but not on escalations based upon future conditions.
>
> (i) Reservoirs are considered proved if economic producibility is supported by either actual production or conclusive formation test....
>
> (iii) Estimates of proved reserves do not include the following ...
>
> (B) crude oil, natural gas, and natural gas liquids, the recovery of which is subject to reasonable doubt because of uncertainty as to geology, reservoir characteristics, or economic factors....

This regulatory language indicates that proved reserves do not include all quantities or oil and gas found in a piece of land, but rather only those quantities of oil and gas which are economically recoverable. Cawley included only such proved reserves in the calculations used to determine the bonuses. Thus, the issue is whether the carbon dioxide, hydrogen sulfide, and helium compounds were proved reserves. Plaintiff argues they were; defendant argues they were not.

■ Plaintiff primarily relies on the deposition testimony and affidavit of Joseph C. White, an engineer, to establish that the compounds were proved reserves. In his deposition testimony, however, White indicates that he made no engineering studies to support his statement that the compounds were indeed proved reserves; rather, he apparently relied on the reports of Cawley. *Appendix to Defendants' Reply Brief in Support Summary Judgment Motion,* exhibit 28, pp. 30, 36–37, 76, 80, 84, 95–97. In his subsequent affidavit, White contends that he did not fully understand the deposition questions and that his answers did not indicate the true nature and depth of his engineering analysis of defendants' oil and gas properties. *Plaintiff's Brief Opposing Defendants' Summary Judgment Motion,* appendix A. White's affidavit, however, does little to strengthen his argument; the affidavit indicates that he reviewed documents and audits, but it does not indicate that he did any independent engineering analysis to show the compounds should have been included in the proved reserves. Furthermore, a party opposing a motion for summary judgment may not attempt to create a sham fact issue to defeat the motion through the submission of affidavits which conflict with earlier sworn statements. *Maddy v. Vulcan Materials Company,* 737 F.Supp. 1528, 1532 (D.Kan. 1990) (citations omitted). In determining whether an affidavit in conflict with earlier sworn testimony should be excluded as an attempt to create a sham fact issue, the Tenth Circuit has enunciated the following test:

> whether the affiant was cross-examined during his earlier testimony, whether the affiant had access to the pertinent evidence at the time of his earlier testimony or whether the affidavit was based on newly discovered evidence, and whether the earlier testimony reflects confusion which the affidavit attempts to explain.

*Franks v. Nimmo,* 796 F.2d 1230, 1237 (10th Cir.1986).

■ Applied to the present case, these factors support the conclusion that White's

affidavit should be disregarded. White's deposition indicates the opportunity for cross-examination, and his testimony during the deposition was clear and unequivocal. There is no indication of genuine confusion in his answers during the deposition. White claims that he was not given the actual percentage Gregg was paid for the bonus years and that he has redone his report to include the correct figures. This new information, however, does not affect White's determinations of what the proved reserves should have been. Therefore, the affidavit will be disregarded as an impermissible attempt to create a sham fact issue.

■ Defendants present the affidavit of Walter J. Evans, a retired consultant for Cawley, who worked on the annual engineering studies of defendants' oil and gas reserves. In his affidavit, Evans states that no information was withheld from Cawley during Cawley's annual determinations of proved reserves. *Appendix to Defendants' Reply Brief in Support of Summary Judgment Motion,* exhibit 29, p. 2. Furthermore, Evans notes that the language of C.F.R. § 210.3–18 requires that the reserves be economically recoverable before they are included within the definition of proved reserves under § 210.3–18. He states that the carbon dioxide, hydrogen sulfide and helium volumes within the reservoir did not meet this requirement. *Id.* at p. 2–3. Thus, as the components were not proved reserves, they were not included in the bonus determinations, which were based on proved reserves. Plaintiff knew that those components which were not economically recoverable would not be included in the reserve reports upon which the bonuses were based. *Id.* at exhibit 24, p. 22. Plaintiff offers no other convincing evidence that would indicate these components were economical to recover; plaintiff's arguments merely indicate that defendants' knew the components existed. *Plaintiff's Brief Opposing Defendants' Summary Judgment Motion,* pp. 14–17. In this case, there is no genuine factual dispute that the carbon dioxide, hydrogen sulfide and helium should not have been included in Cawley's reports as proved resources. Thus, there is no issue for trial, as there is insufficient evidence favoring the nonmoving party for a jury to return a verdict for that party; when the evidence is merely colorable or is not significantly probative, summary judgment may be granted. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249–250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986).

### C

■ Plaintiff's third argument to defeat defendants' summary judgment motion is that defendants did not use the correct formula for converting methane gas reserves to barrels of oil equivalency. (The barrels of oil equivalency figure served as the basis for the Denver division bonus award.) I disagree.

In order for the bonus to be determined, the amounts of gas had to be converted to barrels of oil equivalency. As plaintiff notes, there are two acceptable ways to do make this conversion. The first is a conversion on the basis of a common denominator of heat source, British thermal unit equivalents, which for gas gives 6,000 metric cubic feet to one barrel of oil. The second is based on the economic values of gas and oil. *Plaintiff's Brief in Opposition to Defendants' Motion for Summary Judgment,* Appendix C, exhibit a, pp. 91–92. Defendants used the second formula for the conversion. Defendants used the economic conversion because they were trying to measure the economic benefit to the company; they were not concerned with the heating value of the gas. *Id.,* Appendix C, exhibit E, p. 42. In confusing and unintelligible argument, plaintiff contends defendant should have used the first formula. *Id.* at 11–14.

As the contract did not specify the formula to be used, either could have been chosen and applied. I therefore look to the parties' practice before the dispute arose to clarify their intent. *Smith v. Long,* 40 Colo.App. 531, 578 P.2d 232, 234 (1978). As the second formula based on the economic value conversion was consistently used, this court will not hold that it was inappropriate for defendant to do so. The contract did not specify the conversion formula, and defendants used the second. In the years 1978 through 1984 plaintiff did not question its use. Therefore, the parties' consistent conduct, prior to the

dispute, indicates that the economic value conversion method was the chosen and accepted conversion method. Accordingly, plaintiff's arguments are rejected, and are viewed by this court as an attempt to create a disputed fact where none exists. A federal lawsuit is not a fishing expedition, *Sawyer v. County of Creek*, 908 F.2d 663, 668 (10th Cir.1990), and I will not permit a case to continue in which a plaintiff appears to be embarking upon such an expedition.

## D

█ Plaintiff's final argument to avoid summary judgment is that defendants arbitrarily discontinued the bonus program. Defendants' 1985 Notification of Annual Meeting and Proxy Statement stated that, at the beginning of 1985, this bonus system was indefinitely suspended. *Plaintiff's Brief Opposing Defendants' Summary Judgment Motion*, Appendix C, exhibit 93.

As defendants note, the explanation accompanying the bonus program does not state that the plan will last indefinitely. The explanation states that the allocation of the bonus "will be based on the division manager's recommendation and approval by the Executive Committee." Based on the language of the contract, the executive committee had the discretion to approve or disapprove the bonuses. *Plaintiff's Brief Opposing Defendants' Summary Judgment Motion*, appendix C, exhibit 147, p. 2. The contract, however, is ambiguous concerning the power of the executive committee to terminate the bonus plan.

Plaintiff's arguments regarding forfeiture are misplaced here, because defendant does not argue that plaintiff forfeited any rights. Rather, the question is whether the rights under the contract were fulfilled. Plaintiff makes what amounts to a promissory estoppel argument, although he does not label it as such. The doctrine of promissory estoppel is part of the common law of Colorado:

A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only be enforcement of the prom-

ise. The remedy granted for breach may be limited as justice requires.

*Kiely v. St. Germain*, 670 P.2d 764, 767 (Colo.1983).

Plaintiff has not satisfied the elements of promissory estoppel. Although defendants told plaintiff of the bonus plan, and plaintiff argues he remained in defendants' employment because of the bonus finding plan, plaintiff received bonuses for several years before the plan was discontinued. Plaintiff has produced no evidence which indicates that defendants guaranteed the oil finding bonus plan would be indefinite.

Furthermore, in his deposition, plaintiff stated: (1) he was aware that the oil finding bonus was at the discretion of the Board of Directors; (2) he knew this fact the entire time he participated in the bonus plan; and (3) each year the board reserved the right to vote on whether a bonus would be granted for prior year discoveries. *Appendix to Defendants' Reply Brief in Support of Motion for Summary Judgment*, Exhibit 24, p. 39. Thus, from the bonus plan's very inception, plaintiff knew he could have received no bonus, and that the plan's administration was within the discretion of the executive committee. The board, however, was not free to arbitrarily administer the plan, as the doctrine of promissory estoppel encourages fair dealing in business relationships and discourages conduct which unreasonably causes foreseeable economic loss because of action or inaction induced by a specific promise. *Kiely*, 670 P.2d at 767. I see no evidence that the executive committee failed to deal fairly with plaintiff or that it engaged in conduct which unreasonably caused foreseeable economic loss to plaintiff.

As the explanation to the oil finding bonus plan states, the executive committee had the discretion to approve or disapprove the bonus recommendations made regarding the individuals on the division staff, and the bonus could be adjusted for future years to reflect changes in oil prices. Thus, there was no guarantee that plaintiff would always get a bonus. It was not reasonable that plaintiff would have expected the bonus plan to continue indefinitely. I therefore reject

plaintiff's final argument against defendants' summary judgment motion.

Upon the foregoing, it is

ORDERED that defendants' motion for a final and dispositive order of summary judgment is GRANTED, and judgment shall be entered in favor of defendants and against plaintiff. Defendants shall have their costs.

## ORDER ON MOTION FOR RECONSIDERATION

This matter is before me on plaintiff's "Motion Under F.R.C.P. 59(e) for Reconsideration" filed on March 18, 1991. Plaintiff is seeking reconsideration of my order granting summary judgment for defendants issued on March 6, 1991. My ruling was based on a finding of an absence of any genuine issues of disputed material fact regarding the interpretation of the oil-finding bonus plan administered by Defendant American Quasar Petroleum Company ("AQP") for the benefit of its employees, including plaintiff. Plaintiff disagrees with my finding and makes five points in support of his motion for reconsideration. After thoroughly reviewing the briefs and exhibits submitted in support of and in opposition to this motion, it is clear to me that none of plaintiff's points bring up any new arguments or facts not advanced at the summary judgment stage. Therefore, I reject plaintiff's motion for reconsideration. Nevertheless, I will address each argument advanced by the plaintiff and elaborate on some points I made in my earlier ruling in this case. Familiarity with my *Order* dated March 6, 1991, is assumed, and the facts will not be repeated here.

## ANALYSIS

■ "Although the Federal Rules of Civil Procedure do not explicitly provide for motions for reconsideration, these motions are accepted as the offspring of Fed.R.Civ.P. 59(e) which provides that a motion to alter or amend judgment may be entered within ten days after the entry of the judgment." *Equal Employment Comm'n v. Foothills Title Guar. Co.*, Civ.A. No. 90–A–361, 1991 WL 61012, at *3 (D.Colo. Apr. 12, 1991). A motion for reconsideration is proper when the court has patently misunderstood a party,

has made a decision outside the adversarial issues presented, has made a mistake not of reasoning but of apprehension, or there has been a significant change or development in the law or facts since submission of the issues to the court. *Id.* (citation omitted).

### 1. Interpretation of Contract by Conduct of the Parties

Plaintiff first asserts that the parties' conduct did not establish the existence of an understanding that Cawley, Gillespie & Associates' ("Cawley") determination of proved reserves would be used to calculate the bonus awards. *Memorandum Brief in Support of Motion Under F.R.C.P. 59(e) for Reconsideration* at 2 (filed Mar. 18, 1991) [hereinafter *Plaintiff's Brief*]. Plaintiff maintains that even though he accepted the bonuses and did not contest their accuracy until after his termination, it is now appropriate for him to challenge the method of the bonus computation. I disagree.

Gregg testified in his deposition that he indeed knew, during the course of his employment, that Cawley, an independent engineering audit firm, was used to determine the reserves upon which the oil bonus was calculated. *Gregg Deposition* at 19. It was AQP's consistent practice to hire this firm to compile its annual reserve report, and those reserve figures were then used by AQP to calculate the bonus. The annual report was used for a variety of purposes, not just in calculating the bonuses due to employees. *Defendants' Brief Supporting Motion for a Final and Dispositive Summary Judgment* at 6 (filed Oct. 26, 1990) [hereinafter *Defendants' SJ Brief*]; *Evans Deposition* at 77.

The *Restatement*'s rules on contract interpretation state that:

> Where an agreement involves repeated occasions for performance by either party with knowledge of the nature of the performance and opportunity for objection to it by the other, any course of performance accepted or acquiesced in without objection is given great weight in the interpretation of the agreement.

*Restatement (Second) of Contracts* § 202(4) (1981). *See also Smith v. Long*, 40 Colo.App.

531, 578 P.2d 232, 234 (1978) ("[O]ne of the best methods of determining the true intent of the parties is their behavior and interpretation of the contract before controversy arises"). Plaintiff's knowledge that Cawley was doing the reserve calculations, and his acceptance of the bonuses based on those numbers for seven years are both uncontested facts. The amount of money that Gregg claims is due him is very large—over a million and a half dollars. *Plaintiff's Brief Opposing Defendants' Summary Judgment Motion*, Appendix A ¶ 15 (filed Nov. 26, 1990) [hereinafter *Plaintiff's SJ Response*]. It is important to note that, in over seven years of participation in the bonus plan, Gregg collected a total of $99,875. *Defendants' SJ Brief* at 3. In view of this enormous disparity, how can it be that Gregg had no inkling of an alleged problem with Cawley's methodology until after he was terminated in 1985? I find that the conduct of the parties did indeed establish an agreement that Cawley's reserve calculations would be the basis for the oil-finding bonus.

Plaintiff attempts to create a factual issue by saying that he did not know the details of how the reserves were being calculated. There are a certain number of judgment calls that any engineering firm has to make in performing such an audit. That is an integral part of what it is hired to do. Therefore, by implicitly agreeing to Cawley's performance of the audit, plaintiff was also agreeing to Cawley's use of discretion in doing so. "[W]hen discretion is conferred upon a party to a contract, or upon a third party, the exercise of the discretion cannot be attacked by showing unreasonableness." *Benham v. Mfrs. & Wholesalers Indem. Exch.*, 685 P.2d 249, (Colo.Ct.App.1984). By his prior conduct, plaintiff is therefore precluded from challenging Cawley's discretion at this time.

### 2. Additional Offset Locations

Plaintiff's second argument focuses on Dr. White's inclusion of additional offset locations in his reserve calculations. Plaintiff argues that White's reports indicate proved reserves which Cawley failed to include in its proved reserves calculations. *Plaintiff's Brief* at 4. As I have previously noted, White failed to perform any independent engineering analysis to determine these alleged reserves. *Order* at 8; *White Deposition* at 210–12, 239, 243–45. Instead, White merely reviewed defendants' documents. White speculated about Cawley's method for determining the proved reserves without any colorable basis to impeach Cawley's determinations.

Plaintiff himself admits that Cawley, or any other audit firm that AQP could have hired, was faced with a judgment call in terms of determining the correct number of offset locations. *Reply to Defendants' Response to Plaintiff's Motion Under F.R.C.P. 59(e) for Reconsideration* at 7 (filed Apr. 26, 1991). That is what the auditors are paid to do. As I stated above, since the conduct of the parties established Cawley as the entity to determine the reserves, such matters are within its discretion. A now-retired Cawley employee explained the basis of Cawley's decision with regard to the number of offset locations:

> SEC definitions require all proved undeveloped locations to pass what is called a "reasonable certainty" criteria. The engineer must be reasonably certain of both the existence of the reserves in the estimated quantities and the fact that the well will be drilled. Cawley, Gillespie & Associates, Inc. did, in fact, consider the existence of proved undeveloped resources and assigned 12 offset locations. Other locations did not meet the reasonable certainty criteria.

*Evans Affidavit* at 2.

The affidavits and depositions must show that a genuine issue of material fact is disputed. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986) (citation omitted). The existence of some alleged factual dispute between the parties will not defeat a summary judgment motion. The court determines if there is a genuine issue for trial. If the evidence is merely colorable, or not significantly probative, summary judgment may be granted. *Id.*, 477 U.S. at 249–50, 106 S.Ct. at 2510–11 (citations omitted). White's allegations do not indicate a genuine factual dispute. His statements are mere speculations

about Cawley's methods and determinations. Thus, without other evidence, I must reject White's conclusions.

### 3. White's Sham Affidavit

Plaintiff argues that his expert, Dr. White, properly included components of the gas stream such as carbon dioxide, hydrogen sulfide, and helium in the reserve calculations contained in his affidavit. *Plaintiff's Brief* at 7. These components were not included in the Cawley reserve calculations because they were not considered to be economically recoverable. *Plaintiff's Brief* at 6; *Evans Affidavit* at 2–3. At his deposition, Dr. White testified that he relied on Cawley reports in making such a determination. *White Deposition* at 30, 36–37, 76, 80, 84, 95–97. Then, in a subsequent affidavit filed with the court, he asserted that:

> In my deposition I did not fully understand Mr. Munn's (AQP's counsel) questions and often at times I was confused when I answered his questions. Also, Mr. Munn's questions were often very narrow and limited my responses in a manner that did not indicate the true nature of my engineering analysis of AQP's oil and gas properties.

*Plaintiff's SJ Response*, Appendix A ¶ 1. Yet, nothing in the rest of the affidavit demonstrates that White had performed a truly independent engineering analysis. I have already held that I view the changes in White's testimony from his deposition to the affidavit to be self-serving and an attempt to create a factual issue. *Order* at 9.

It is clear from language cited by plaintiff himself that these components of the gas stream were not then economically recoverable. "[D]ue to initial start-up costs involved with gathering and processing of the raw gas stream, none of these wells have been tied into a gas gathering system, and will remain shut-in until such time as market conditions allow construction of a gas gathering and processing facility." *Plaintiff's SJ Response*, Appendix C, ex. 133 (Letter from Anderson, Agent of Wolverine Exploration Company to Chase, Chief, Branch of Fluid Minerals, Department of Interior of March 26, 1990). This statement was made in 1990, and these gases had therefore not become economically

recoverable even some four years after the years at issue in this case. Cawley correctly did not add these components of the gas stream into the reserve calculations. Time has shown that despite AQP's "highly touting" carbon dioxide and other gases in various internal reports (*see Plaintiff's Brief* at 7), these components of the gas stream have not proven to be money makers for AQP. Optimistic, forward-looking statements do not equal realistic calculations of what is economically recoverable today.

### 4. Company Biased Conversion Factor

Plaintiff's fourth argument regarding the equivalency conversion is similarly without merit. The basis of this argument is that AQP picked a conversion factor that favored the oil company in that it understated the amount of gas discovered. *Plaintiff's Brief* at 8. The stated goal of AQP in using this factor was to measure the economic benefit of the discoveries to the company. Gregg argues that he relied on the fact that AQP was using an "industry standard" of 6:1 for converting a cubic foot of gas to a barrel of oil equivalent. *Id.* This conversion rate is based on the energy content of the fuels, not economic value. Defendants argue that it should be within the discretion of the company to use an economic value conversion ratio rather than an energy content conversion ratio. I agree. There is no statement to the contrary in the explanation of the oil-finding bonus plan. Both methods of conversion are acceptable and used in the industry. *Re Phillips Petroleum Co.*, 24 FPC 537, 559–60 (1960) (approving use of economic value factor of 24:1 as opposed to Btu energy content factor of 6:1), *aff'd sub nom. State of Washington v. Federal Power Comm'n*, 303 F.2d 380 (D.C.Cir.1961), *aff'd*, 373 U.S. 294, 83 S.Ct. 1266, 10 L.Ed.2d 357 (1963). *See also White Deposition* at 129–32; *Evans Deposition* at 22–23. Economic enhancement of the value of the company is what AQP was rewarding with its oil-finding bonus plan, and this conversion factor is therefore reasonable.

### 5. Discontinuance of the Bonus Plan

Plaintiff's fifth argument is that some notice should have been given before the bonus

system was indefinitely suspended. *Plaintiff's Brief* at 9. In essence, plaintiff attempts to compel this court to engraft a notice provision into the bonus plan. I decline to do so. Nothing in the bonus plan indicates that such notice was required. Everyone, including Gregg, understood that the bonus plan was completely discretionary. *Gregg Deposition* at 39 ("Q: So each year the board reserved the right to vote on whether a bonus would be granted for prior year discoveries and ultimately did in fact terminate the program? A: Yes"); *Lowe Deposition* at 16, 42. *See Benham,* 685 P.2d at 253.

Another point should be made about the discretion of the Executive Committee with regard to the bonus plan. "The allocation [of the bonus money] among the division staff will be based on the division manager's recommendation and approval by the Executive Committee." *Plaintiff's SJ Response,* Appendix C, ex. 147 (explanation of oil-finding bonus plan). Since allocation was discretionary, it would be impossible for Gregg to prove that he personally would have received a larger bonus, even if the Denver division as a whole was entitled to a larger bonus. There is absolutely nothing in the record which explains how the Executive Committee did the allocation. Therefore, it is quite a leap to assume, as plaintiff seems to do, that he would have been awarded at least the same percentage of a bigger bonus. In fact, plaintiff did not get the same percentage of the Denver division bonus from year to year. *Plaintiff's SJ Response,* Appendix A ¶ 15. His percentage of the bonus fluctuated from a low of 12.72% to a high of 44.59%. *Id.* Although this issue is not addressed by either party in their briefs, this is yet another important hurdle that plaintiff would have needed to cross in order to be entitled to a monetary recovery in this case.

On the basis of the foregoing conclusions, it is therefore

ORDERED that plaintiff's motion for reconsideration is DENIED.